UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

LUPIN ATLANTIS HOLDINGS SA,
a foreign corporation, and LUPIN INC.,
a Delaware Corporation,

      Plaintiff,

v.

XIAN-MING ZENG, TRANSPIRE
BIO, INC., AXEL PERLWITZ, and
WILLIAM SCHACHTNER,

      Defendants.
_____/

## COMPLAINT

    Plaintiffs, Lupin Atlantis Holdings SA, ("LAHSA") and Lupin Inc. (collectively "Plaintiffs"), by and through their undersigned counsel, file this Complaint against Defendants, Xian-Ming Zeng ("Zeng"), Transpire Bio, Inc. ("Transpire"), Axel Perlwitz ("Perlwitz"), and William Schachtner ("Schachtner"), and allege:

## A.    INTRODUCTION

    1.    Lupin Atlantis Holdings SA and Lupin Inc. file this action for damages for misappropriation of trade secrets under the Defendant Trade Secrets Act, misappropriation of trade secrets under the Florida Uniform Trade Secret Act, conversion, breach of contract, breach of fiduciary duty, and conspiracy.

    2.    Lupin Inc., and its affiliated entities (collectively "Lupin"), are a group of companies that develop and market a wide array of pharmaceutical products sold globally. In

2013, Lupin hired Zeng to spearhead a cutting-edge team of research and development professionals to grow Lupin's inhaled pharmaceutical product division.  To protect its interests, Lupin required Zeng to execute an agreement that included non-solicitation and confidentiality provisions.

3.      When Zeng resigned his employment with Lupin in 2021, he was earning an annual base salary of $579,088.08.

4.      He falsely told Lupin that he was leaving the pharmaceutical field to return to China to spend more time with his family.

5.      Zeng was truly planning to launch Transpire, a competing business to Lupin, of which Zeng currently serves as Chief Executive Officer.

6.      To date, Zeng has successfully poached ten Lupin executives and scientists, including four of its top executives, to work for Transpire. As a result of Zeng's departure and poaching activities, Zeng has directly caused a turnover of roughly 24% of Lupin's inhaled product team, causing disruption to Lupin's ongoing projects and putting Lupin at a severe disadvantage.

7.      Until recently, Transpire's website designated Zeng and all the former Lupin executives as *cofounders* of Transpire.

8.      Zeng's bad acts do not stop with solicitation of Lupin's employees in violation of his agreement.  In the final months of Zeng's employment, Zeng copied Lupin's confidential information and trade secrets to external devices and to a cloud storage account, presumably to give Transpire a competitive advantage over Lupin. Indeed, Zeng inserted eighteen external drives into his Lupin laptop during his employment and failed to return any of those devices to Lupin when he resigned, which is a breach of his agreement with Lupin.

9.      As his last act during his employment at Lupin, Zeng simultaneously accessed 128 of Lupin's files containing confidential and trade secrets from his company laptop computer at 6:33p.m., indicating a copy and paste of a mass amount of data. There is no justification for Zeng to have accessed these files at once other than to misappropriate them for the benefit of Transpire.

10.     Zeng also attempted to cover his tracks by utilizing a Microsoft Cleaning tool and deleting all emails from his company Outlook email account.

## B.      PARTIES, JURISIDCTION AND VENUE

11.     Plaintiff, LAHSA, is, and at all times material hereto was, a foreign company.

12.     Plaintiff, Lupin Inc. is, and at all times material hereto was, a Delaware Corporation.

13.     Defendant, Xian-Ming Zeng ("Zeng"), is and at all times material hereto was, an individual residing in Broward County, Florida.

14.     Defendant, Transpire Bio, Inc. ("Transpire") is, and at all times material hereto was, a Florida corporation registered and doing business in the state of Florida.

15.     Defendant, Axel Perlwitz ("Perlwitz"), is and at all times material hereto was, an individual residing in Broward County, Florida.

16.     Defendant, William Schachtner ("Schachtner"), is and at all times material hereto was, an individual residing in Broward County, Florida.

17.     This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331 because this action raises claims under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836(c). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same operative facts as its federal claim.

18.     The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

19.     Personal jurisdiction is proper in Florida because Defendants Zeng, Perlwitz, and Schachter are citizens of and reside in Florida, and all Defendants operated, conducted, engaged in, or carried on a business or business venture in the state of Florida.

20.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants reside and operate a business in this district and the events or omissions giving rise to the claims against Defendants occurred and continue to occur in this district.

21.     All conditions precedent to bringing this action have occurred, have been satisfied, or have otherwise been waived.

## C.     LUPIN'S BUSINESS

22.     Lupin and its affiliates (defined above as "Lupin") operate a pharmaceutical company generating revenue from both branded and generic pharmaceutical products.  It has commercial operations and capabilities in the US, India, Canada, Europe, and other major markets.

23.     Lupin's United States research and development business operations, including various labs, research centers, and laboratories, are controlled by the Lupin Inc. entity.

24.     Lupin's Research and Development ("R&D") division is a leading pharmaceutical solutions provider in the United States and in India.  It develops solutions that allow Lupin to deliver affordable quality medicines, such as, complex generics, biosimilars and specialty therapeutics, to the marketplace to address unmet patient needs.

25.     Lupin and its affiliates employ over 1,400 scientists and R&D personnel in several countries, including in Florida and New Jersey in the United States.  Lupin's R&D teams use

cutting-edge technologies, superior competencies, and strategic partnerships to deliver unique solutions that give it an advantage in the regions where it operates. Lupin maintains an Intellectual Property Management Group (IPMG) which is responsible for creating, securing, and leveraging advanced research to build a high-value portfolio of patents, products, and research pipeline products. Lupin has built a strong portfolio of IP assets by filing 430 ANDAs and 7 NDAs to date, of which 273 and 4, respectively, have been approved by the US FDA.

26.     At Lupin's Center of Excellence for Inhalation Research in Coral Springs, Florida, Lupin employees are developing a range of inhalation products for local and global markets as well as the development of proprietary inhalation devices to deliver those products. At the time of Zeng's resignation, Lupin employed roughly 45 employees at its Center of Excellence for Inhalation Research in Coral Springs, Florida.

27.     Lupin is strategically focused on growing its inhalation franchise and has invested a considerable number of resources into its Coral Springs facility and the employees who work there.

28.     Lupin has expended substantial amounts of time, effort and money in its scientist, R&D personnel, and project managers, as well as its trade secrets and valuable confidential business information which Lupin provided to said individuals so they may perform their respective jobs.

29.     The pharmaceutical industry is extremely competitive, and Lupin has, over the course of roughly two decades, expended substantial time, money, and effort in the development and commercialization of generic and branded inhalation products. To that end, Lupin has expended substantial time, money, and effort in the development of its products, services, professional reputation, goodwill, and sales networks throughout the United States and other parts

of the world. In doing so, Lupin has developed highly valuable confidential and proprietary business information, as well as trade secrets including, without limitation, product formulations and development information, product inventions and plans, profit information, proprietary manufacturing processes, FDA approval guidance, current and prospective customer and vendor lists and related databases, equipment lists, pricing data, purchasing histories, consumer data, market intelligence and strategies, and overall industry and product expertise (the "Trade Secrets").

30.     Entering the inhalation pharmaceutical market requires years of research and development which can span years or decades.

31.     Neither Lupin's confidential and proprietary information nor the Trade Secrets are publicly known or reasonably ascertainable by competitors or other third parties, and Lupin has taken reasonable measures to maintain the confidentiality and secrecy of all such information.

32.     Lupin derives independent economic value from the Trade Secrets and valuable confidential business information not being generally known or readily ascertainable by proper means by others who can obtain economic value from its disclosures or use.

33.     Because of the importance that Lupin's trade secrets and valuable confidential business information remain confidential, Lupin took affirmative steps to preserve the secrecy of that information.

34.     Lupin's employee handbook promulgates policies with respect to the confidential nature of its information and prohibits employees from copying, removing, using, or disclosing Lupin's confidential information to anyone outside of Lupin.

35.     Lupin's physical facilities were and are locked at all times and require the use of a trackable keycard for access.

CASE NO._____

36.     Lupin's confidential and proprietary information and Trade Secrets were and are stored in electronic data network and devices accessible only through passcode protected username, for which access had to be given by Lupin.

37.     Lupin employed network segregation to limit the access to the network to ensure that Lupin's most valuable confidential information and trade secrets are accessible on a need-to-know basis only.

38.     Before granting access to Lupin's confidential and trade secret protected information, Lupin required employees to sign confidentiality agreements in which they agreed not to copy, use, or disclose the information for any purpose.

### D.     ZENG'S ROLE AT LUPIN

39.     Defendant, Zeng was hired by Lupin in 2013 as Senior Vice President, Research and Development Inhalation, where some of his core functions was to build and spearhead a team of world-class talent to accomplish the research and development initiatives of the company, and to develop global inhalation research and development capabilities and implement R&D systems, procedures, and best practices across the R&D teams in various geographical locations.

40.     In connection with his employment with Lupin, Zeng signed an agreement (the "Agreement") with Lupin Pharmaceuticals, Inc. on or about April 3, 2013.  A copy of the Agreement is attached hereto as **Exhibit 1**. [1]

41.     Pursuant to the Employment Agreement, Zeng was entitled to an annual salary of $450,000, an annual discretionary bonus of 40% of his base compensation, and a one-time

---

[1] On January 14, 2014, Lupin assigned its rights and obligations under the Agreement to Lupin GmbH.  A true and correct copy of the Assignment of Employment is attached hereto as **Exhibit 2**. On April 1, 2020, Lupin GmbH merged with LAHSA, transferring all of GmbH's assets, including the Employment Agreement, to LAHSA.

CASE NO._____

$100,000 signing bonus. At the time of his departure, Zeng was earning an annual base salary of $579,088.08, in addition to his discretionary bonus.

42.     From June 2016 to his resignation on October 1, 2021, Zeng held the title of Executive Vice President, Head of Inhalation and Complex Injectables Research and Development in Coral Springs, Florida.

43.     In that role, Zeng was responsible for leading all aspects of R&D for the inhalation portfolio and was accountable for manufacturing at the Center of Excellence for Inhalation Research at Coral Springs, Florida.

44.     During his employment at Lupin, Zeng built a successful team of professionals and scientists and led the successful design and execution of Lupin's global inhalation capability, including the development of Albuterol MDI, the only commercialized generic to ProAir in the U.S. market, Tiotropium DPI, the first to file generic of Spiriva Handihaler with commercialization in August, 2023, and Luforbec, the first generic of Fostair approved and launched in the United Kingdom.

45.     During his employment at Lupin, Zeng had access to the Trade Secrets and otherwise protected information, including research and development; inventions; training materials and manuals; training methodologies; computer programs; cost structures; profit information; pricing information; sales and marketing information and strategies; customer and dealer lists; preferences and purchase histories; financial, strategic, and managerial business information; business practices, processes, procedures, plans for developing new products, and the names of key employees and their individual and collective knowledge base.

46.     Due to the sensitive nature of the information Zeng was granted access to through his employment, Zeng expressly agreed to protect Lupin's confidential and trade secret protected

CASE NO._____

information.    Specifically, Zeng agreed to the following provisions concerning Lupin's confidential and trade secret protected information:

<u>Confidentiality</u>.

(a) You agree that all information, whether or not in writing, of a private, secret or confidential nature concerning the Company's past, present and future business, business relationships or financial affairs (collectively, —Proprietary Information) is and shall be the exclusive property of the Company.  By way of illustration, but not limitation, Proprietary Information may include customer lists, customer and supplier information, contacts at or knowledge of customers or prospective customers of the Company, inventions, products, processes, methods, techniques, formulas, projects, developments, plans, research data, financial data, personnel data, computer programs and modules—both source and object codes, display screens and layouts, intranet files and data, server-side website documents and files, functions, subroutines, procedures, variable definitions, libraries and linking scripts.  You will keep confidential and will not disclose any Proprietary Information to any person or entity other than employees of the Company or use the same for any purposes (other than in the performance of his duties as an employee of the Company) without written approval by the Company, either during or after your employment with the Company, unless and until such Proprietary Information has become public knowledge without fault by you.

(b) You agree that your obligation not to disclose or to use information and materials of the types set forth herein, and your obligation to return materials and tangible property, also extends to such types of information, materials and tangible property of customers of the Company or suppliers to the Company or other third parties who may have disclosed or entrusted the same to the Company or to you.

(c) In the event of a breach of any of the provisions of this Section 6, in addition to any other remedies it may have at law or in equity, the Company shall be entitled immediately to seek enforcement of this Section 6 in a court of competent jurisdiction by means of a decree of specific performance, an injunction without the posting of

a bond or the requirement of any other guarantee, and any other form
of equitable relief.  In addition, you recognize, acknowledge and
agree that the Company is entitled to recover from you the costs and
attorney's fees it incurs to enforce the terms of this Section.  This
provision is not a waiver of any other rights which the Company
may have under this Agreement, including the right to recover
money damages.  *See*, Exhibit "1."

47.     Further, Zeng expressly agreed that, upon the termination of his employment, he

would return to Lupin all Lupin property in his possession:

> <u>Company Property</u>.  All correspondence, records, documents,
> software, promotional materials, and other Company property,
> including all copies, which come into your possession by, through
> or in the course of your employment, regardless of the source and
> whether created by you, are the sole and exclusive property of the
> Company, and immediately upon the termination of your
> employment, or at any time the Company will request, you will
> return to the Company all such property of the Company, without
> retaining any copies, summaries or excerpts of any kind or in any
> format whatsoever. You will not destroy any Company property,
> such as by deleting electronic mail or other files, other than in the
> normal course of your employment. You further agree that should
> you discover any Company property or Confidential Information in
> your possession after the return of such property has been requested,
> you will return it promptly to Company. See, "Exhibit 1."

48.     All the trade secrets and confidential business information related to the research,

development, approval, and manufacturing inhalation products that Zeng had access to or

developed at Lupin apply to the business of Defendant, Transpire.

49.     In addition to Zeng's confidentiality restrictions, Zeng also agreed not to solicit,

induce, or influence employees of Lupin or any of its affiliates to leave or alter their employment

or a business relationship with Lupin or any of Lupin's affiliates.  That restriction was in force

during his employment at Lupin and for one year after his separation from the company.  (*See*

Agreement attached as Exhibit "1").  Specifically, Zeng agreed to the following:

> Non-Solicitation Covenant. You agree that during your employment
> with the Company and for one year thereafter, you will not, without
> the Company's prior written consent, attempt to, directly or
> indirectly, (i) employ, solicit for employment, or recommend for
> employment any person employed by the Company (or any of its
> affiliates), or (ii) induce or influence any present or future employee
> of the Company (or any of its affiliates) to give up, or to not
> commence, employment or a business relationship with the
> Company (or any of its affiliates). See, Exhibit "1."

50.     The restraint on solicitation and disclosure specified in the Agreement are

reasonably necessary to protect Lupin's legitimate business interests, such as (a) trade secrets, (b)

valuable business information, (c) the investment in the education and training of its employees

(d) and confidential and proprietary information.

### E.      Zeng's Resignation from Lupin

51.     On August 16, 2021, Zeng drafted a resignation letter, setting forth his intention to

end his employment with Lupin.

A copy of Zeng's Resignation Letter is attached hereto as **Exhibit 3**.

52.     Upon information and belief, Zeng's intention to resign from his employment from

Lupin spanned back months from the date he drafted on his Resignation Letter, in order to afford

Zeng significant time to plan his subsequent employment and next career steps.

53.     In the Resignation Letter, Zeng stated the reasons for his departure from Lupin.

Specifically, Zeng informed Lupin that his reasons for leaving Lupin was to move to China to

spend more time with his aging parents:

> The decision to leave Lupin has been a difficult one to make for I
> have thoroughly enjoyed working here. However, the outbreak of
> Covid-19 has changed many of our perspectives and plans for life
> and career. In particular, our inability to travel because of the
> pandemic has prevented us from visiting our family members in
> China for over two years. Our parents are all getting frail day by
> day. As their eldest children, my wife and I both feel strongly that

CASE NO._____

> it is our duty to be with them when they need us the most. As such, we have decided to move back to China so that we can spend more time with our ageing parents. I have therefore accepted an offer to serve as the Chief Scientific Officer of a large, non-pharmaceutical company headquartered in Shenzhen, China.

*Id.*

54.     Zeng's last day of employment at Lupin was October 1, 2021.

55.     After Zeng's last day of employment, Zeng commenced employment with Smoore International, one of the world's largest vaping and electronic cigarette device manufacturers.

56.     It is now become clear that Zeng stated reason for departing Lupin was under false pretenses, and that he left Lupin in order to focus on building and operating Transpire as a competing business to Lupin.

57.     After Zeng resigned from Lupin, he traveled to China, where upon information and belief he obtained seed money to begin his competing business with Lupin.

### F.     TRANSPIRE'S BUSINESS

58.     Zeng incorporated Transpire on April 12, 2022. The incorporation papers were filed on Zeng's behalf by an attorney of a Beijing-based corporate law firm.

59.     Transpire is a research and development company focused on developing inhalation drug delivery medicines and is a direct competitor of Lupin, specifically in the asthma and Chronic Obstructive Pulmonary Disease ("COPD") space.

60.     Transpire's stated goal is to develop and commercialize lower cost generic inhalation drug products for common diseases around the world, and to develop and innovate inhalation therapeutics for diseases with few treatment options for distribution around the world.

61.     Zeng is also the GVP of Smoore International, which upon information and belief, can create inhalation devices for Transpire's inhalation drug products.

CASE NO._____

62.     The leadership team at Transpire consists of five officers all of whom are former Lupin executives, i.e., Zeng, as Chief Executive Officer and founder, William Schachtner, Chief Technical Operations Officer and cofounder, Axel Perlwitz, Ph.D., Chief Regulatory Officer and cofounder, Abhishek Gupta, as Chief Science Officer and cofounder, and Mark Lepore as Chief Medical Officer and cofounder:









**Xian-Ming Zeng Ph.D.**
Chief Executive Officer (CEO)

**Mark S. Lepore, M.D. FAAAAI**
Chief Medical Officer (CMO)

**Abhishek Gupta Ph.D., PMP**
Chief Scientific Officer (CSO)
Chief Corporate Development Officer (interim)

**William Schachtner**
Chief Technical Operations Officer (CTOO)

**Axel Perlwitz Ph.D.**
Chief Regulatory Affairs Officer (CRAO)

63.     Transpire's website originally represented that Zeng, Perlwitz, and Schachtner were cofounders of Transpire, however, the website was amended to remove the cofounder titles after Defendants received notice of Lupin's claims.

64.     Zeng solicited and hired these individuals away from Lupin with the full knowledge and consent of Transpire.

CASE NO._____

65.     Perlwitz and Schachtner, as cofounders of Transpire, were involved with Transpire at its inception in April 2022 all while they worked at Lupin.

66.     Upon information and belief, Perlwitz and Schachtner were aware of Zeng's non-solicitation obligations as they owed similar non-solicitation obligations to Lupin by virtue of common law.

67.     Transpire advertises on its website to have various bioequivalence products in its pipeline, reflecting several projects in the formulation and development stage:



68.     Based on the short time Transpire has been in existence, it is highly unlikely that Transpire's pipeline projects could attain the progress in the formulation and development stage advertised on Transpire's website without the use of Lupin confidential information and trade secrets and the knowledge of Lupin's employees.

**G.      ZENG'S POACHING ACTIVITIES AND PLAINTIFFS' OBJECTIONS**

69.     During his employment and immediately after Zeng resigned, Zeng began soliciting Lupin executives and other key employees in violation of his non-solicitation agreement to work for Transpire.

70.     Upon information and belief, Zeng's solicitation efforts commenced as late as August 19, 2021, when he began to access the resumes of Lupin employees on his Lupin issued laptop.

CASE NO._____

71.     From at least October 1, 2021 to the present, Zeng has aggressively solicited Lupin's employees to work for Transpire.

72.     After Zeng's employment with Lupin ended, Lupin learned that Zeng was soliciting or attempting to solicit its employees in violation of his non-solicitation agreement.

73.     In response to the information that Zeng was again soliciting its employees, Lupin's CEO contacted Zeng to remind him of his obligations and how important inhalation research and development was to Lupin and told Zeng that Lupin is concerned about Zeng's active poaching of Lupin employees.   In response, Zeng assured Lupin's CEO that his plan was to hire newly graduated scientists, and not employees from Lupin.

74.     Despite Zeng's representations, Zeng has continued his solicitation and poaching of Lupin's employees, resulting in ten employees departing Lupin to work for Transpire.

75.     Zeng's departure and solicitation has caused a turnover of 24% of Lupin's staff employed at the Center of Excellence for Inhalation Research at Coral Springs (11 out of 45 employees).   Undoubtedly, this turnover, directly caused by Zeng's actions, has put Lupin at a significant disadvantage in moving its ongoing projects forward.

76.     On May 25, 2022, Lupin delivered a cease-and-desist letter to Zeng, CEO of Transpire informing Zeng of his violations of his non-solicitation agreement with Lupin and demanding that Zeng immediately cease and desist from directly or indirectly soliciting and hiring employees of Lupin.   The letter informed Zeng to preserve all documents and information related to the recruitment, solicitation, application process, and hiring of Perlwitz and any other former Lupin employees.

77.     On June 22, 2022, William Schachtner, Sr Director, Project Management & Manufacturing, resigned to join Zeng at Transpire as its Chief Technical Operations Officer.

CASE NO._____

78.     Zeng successfully solicited Axel Perlwitz, Executive Director, Regulatory Affairs to resign from Lupin on October 5, 2022, to work for Transpire as its Chief Regulatory Affairs Officer.

79.     In addition to the executives poached by Zeng referred to above, Zeng has directly and indirectly, including using Transpire agents, solicited employees working at Lupin's Coral Springs location to fill these positions, and they have successfully poached the following additional Lupin employees for employment at Transpire in the Coral Springs, Florida area:

> a) Thu Dao, Sr. Operations Technician;
>
> b) Guizhen Huang, Scientist II;
>
> c) Vicmary Rodriguez Cruz, Scientist II;
>
> d) Marzena Sanquini, Senior Scientist;
>
> e) Barbra Santiago Colon, Quality Control Scientist I;
>
> f) Greer Balladin, Scientist I; and
>
> g) Derek Kuhn, Quality Control Analyst.

80.     All the employees that Defendants have solicited and hired to leave Lupin to work for Transpire have between three to nine years of experience at Lupin.  These employees also have access and knowledge of Lupin's trade secrets and valuable confidential business information related to inhalation products and commercialization, and have signed confidentiality and nondisclosure agreements to prevent the disclosure and use of such information.

81.     The purpose of Defendants soliciting and hiring these individuals is to gain access to and use Lupin's drug inhalation trade secrets and valuable confidential business information for Zeng and Transpire's benefit in unlawful competition with Lupin.

82.     The purpose of Defendants' actions is to gain access to Lupin's confidential, proprietary and trade secret information that these scientists, researchers, and operational personnel possess to gain a competitive advantage in the business of inhalation technology,

CASE NO._____

including to save the cost of training and developing less experienced scientists and newly graduated scientists.

### H.    ZENG'S MISAPPROPRIATION OF TRADE SECRETS

83.    After observing the unusual speed in which Transpire progressed through the formulation and development stages of its products and after discovering that Zeng flouted his obligations under the Agreement by soliciting Lupin employees, Lupin began to suspect that Zeng still possessed Lupin's confidential information and Trade Secrets.

84.    Lupin thereafter commenced an investigation of Zeng's Lupin issued laptop to determine the extent to Zeng's misappropriation of trade secrets.

85.    Lupin learned from its investigation that Zeng has misappropriated Lupin's data. Indeed, Zeng connected 18 mass storage devices to his Lupin issued laptop between December 7, 2016 and September 21, 2021, in addition to other activity which indicates a misappropriation of trade secrets.  Below is a non-exclusive list of events which demonstrate Zeng's misappropriation:

     a.    On October 1, 2021 at around 6:33p.m. – Zeng's last day of employment – Zeng accessed en masse 128 files from different locations on the laptop hard drive and other drives.  These files consisted of Lupin trade secret information pertaining to equipment lists and proprietary research and development documents, such as (1) Asthma and COPD Pipelines for Inhalation Products – 8.10.15.xls; (2) Lupin Inhalation R & D in Miami.pptx; (3) Inhalation R&D Strategic Documents.docx; (4) MDI Formulation instrument list.doc; (5) 01-DPI analytical equipment list.doc; and (6) DPI formulation equipment list.doc

CASE NO._____

b.  On September 21, 2021, Zeng accessed or opened three files while an external storage device was connected to his Lupin issued laptop.  Among the documents accessed was a file named 150118 Florida R&D Capabilities.pptx.

c.  On August 27, 2021, Zeng connected a generic USB device for the first time and accessed 17 files from Lupin's network, including (1) Development Capabilities, (2) Development Capabilities/DPI formulation equipment list.doc; (3) Lupin Inhalation R&D organization/top level project cost by year.xlsx; (4) Inhalation R&D Strategic Documents.doc; and (5) Lupin Inhalation R&D in Miami.pptx

d.  On August 20, 2021, Zeng accessed a private Lupin Server while a USB device was connected to his Lupin issued laptop.   During that time, Zeng accessed confidential meeting notes and US regulatory correspondences.

e.  On August 19, 2021, Zeng accessed several sensitive documents while a USB device was connected to his laptop.  These documents pertained to development of a Tiotropium Dry Powder Inhaler - a device.  A product which Lupin has received FDA approval.

f.  On August 9, 2021, Zeng accessed several files and folders around the same time while an external storage device was connected, including sensitive files pertaining to the Albuterol inhaler.

g.  On July 8, 2021, Zeng accessed several files and folders at the same time while an external storage device was connected to his Lupin issued laptop, including documents pertaining to the Dulera inhaler.

CASE NO._____

86.     There was no justification for Zeng to have utilized external storage devices while accessing Lupin's most sensitive information and not return the device to Lupin other than to take the information for his benefit or that of a competitor.

87.     Zeng's misappropriation was willful and Zeng went to great lengths to cover his tracks.  Upon information and belief, on August 20, 2021, Zeng utilized a Microsoft Cleanup tool, to hide evidence of his misappropriation. Similarly, on September 28, 2021, Zeng deleted all items in his Outlook email account.

88.     On Zeng's last day of employment, he left his Lupin issued laptop in his work desk drawer.

89.     Other than leaving his Lupin issued laptop at Lupin's premises, Zeng did not return to Lupin any documents, files, or electronic storage devices.

## I.     LUPIN'S DEMANDS FOR THE RETURN OF ITS TRADE SECRETS AND CONFIDENTIAL INFORMATION

90.     On August 14, 2023, Lupin sent a letter to Zeng and Transpire demanding that they cease and desist from using Lupin's confidential information and Trade Secrets, and to immediately return all such information on or before August 21, 2023.

91.     Neither defendant has returned the external storage devices or Lupin's confidential information and Trade Secrets and has continued to possess and use the information, necessitating the filing of this Complaint.

## J.     DAMAGE TO PLAINTIFFS

92.     As a result of Defendants' misappropriation and retention of Lupin's confidential information and Trade Secrets, Plaintiffs have suffered damages including loss of its confidential

and proprietary business and Trade Secret information, loss of business opportunities, and other damages not yet known at this time.

93.     Lupin has retained the services of the undersigned counsel to represent it in this matter and is obligated to pay its counsel reasonable attorneys' fees.  In the event it is the prevailing party in this matter, Plaintiff is entitled to an award of its attorneys' fees against Defendants, pursuant to 18 U.S.C. § 1836,  Fla. Stat. § 688.005, and the Agreement.

### COUNT I
### MISAPPROPRIATION OF TRADE SECRETS UNDER THE
### DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836)
### (Against Zeng and Transpire)

94.     Lupin Inc. repeats and reasserts each and every allegation contained in Paragraphs 1 through 93 of this Verified Complaint, as though fully set forth herein.

95.     Lupin Inc. possesses Trade Secrets, which include non-public information relating to product formulations and development information, product inventions and plans, profit information, proprietary manufacturing processes, FDA approval guidance, current and prospective customer and vendor lists and related databases, equipment lists, pricing data, purchasing histories, consumer data, market intelligence and strategies relating to Lupin Inc.'s business.  These Trade Secrets derive independent economic value, actual or potential, from not being generally known to the public and not being readily ascertainable by proper means by the public or any other person who may obtain commercial or economic value from the disclosure of such information.

96.     Lupin Inc. has made reasonable efforts under the circumstances to maintain the secrecy of such confidential and proprietary information and Trade Secrets by taking steps to protect it.  These efforts include, but are not limited to, promulgation and publication of a

CASE NO._____

Confidentiality Policy, secure premises, and password protection on its secure network which has different levels of access.

97.     Zeng and Transpire misappropriated Lupin Inc.'s Trade Secrets without the knowledge or consent of Lupin and with the purpose of utilizing them for her own benefit and to gain an unfair competitive edge against Lupin Inc.

98.     Zeng and Transpire knew that Lupin Inc.'s Trade Secrets were the property of Lupin and that such property constituted confidential Trade Secrets, that Zeng had a duty to Lupin and a common law obligation to maintain their secrecy or limit their use, and that Zeng was not permitted to remove, utilize, or disclose the Trade Secrets. Zeng and Transpire's actions, therefore, were willful and malicious.

99.     Zeng utilized Lupin Inc.'s Trade Secrets for personal gain and/or for the benefit of Transpire.

100.     Zeng and Transpire have been unjustly enriched by profiting from their misappropriation, use, or disclosure of Lupin Inc.'s Trade Secrets. Lupin Inc. is entitled to imposition of a constructive trust requiring Zeng and Transpire to disgorge to Lupin Inc. any amounts it has received or benefitted through their violations of the DTSA.

101.     Zeng and Transpire's actions were taken in willful, wanton, and/or reckless disregard of Lupin Inc.'s rights and warrant the imposition of exemplary damages.

102.     For all these reasons, Lupin Inc. is entitled to bring a civil action under DTSA for misappropriation of trade secrets.

WHEREFORE, Lupin Inc. demands the following:

(a)     injunctive relief preventing Zeng and Transpire from utilizing Lupin Inc.'s confidential and proprietary information and Trade Secrets, and requiring

CASE NO._____

the disgorgement and immediate return of all of Lupin's confidential information and Trade Secrets Defendants' possession, custody, or control, and ordering Defendants to provide their devices and cloud storage accounts for a forensic examination;

(b)     attorneys' fees and costs incurred in bringing this action pursuant to applicable statutes including, but not limited to, 18 U.S.C. § 1836;

(c)     actual damages flowing from Zeng and Transpire's misappropriation of Lupin Inc.'s confidential information and Trade Secrets; and

(d)     all other remedies available at law or in equity as this Court deems just and appropriate.

## COUNT II

## MISAPPROPRIATION OF TRADE SECRETS/VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT (Fla. Stat. § 688.001, *et seq.*)
### (Against Zeng and Transpire)

103.     Lupin Inc. repeats and reasserts each and every allegation contained in Paragraphs 1 through 93 of this Verified Complaint as though fully set forth herein.

104.     Lupin Inc. possesses Trade Secrets, which include non-public information relating to product formulations and development information, product inventions and plans, profit information, proprietary manufacturing processes, FDA approval guidance, current and prospective customer and vendor lists and related databases, equipment lists, pricing data, purchasing histories, consumer data, market intelligence and strategies relating to Lupin Inc.'s business. These Trade Secrets derive independent economic value, actual or potential, from not being generally known to the public and not being readily ascertainable by proper means by the

CASE NO._____

public or any other person who may obtain commercial or economic value from the disclosure of such information.

105.    Lupin Inc. has made reasonable efforts under the circumstances to maintain the secrecy of such confidential and proprietary information and Trade Secrets by taking steps to protect it.   These efforts include, but are not limited to, promulgation and publication of a Confidentiality Policy, secure premises, and password protection on its secure network which has different levels of access.

106.    Zeng and Transpire intentionally misappropriated Lupin Inc.'s Trade Secrets and Confidential Information without the knowledge or consent of Lupin Inc.

107.    Zeng and Transpire knew that Lupin Inc.'s Trade Secrets were the property of Lupin Inc. and that such property constituted confidential Trade Secrets, that Zeng had a duty to Lupin Inc. and a common law obligation to maintain their secrecy or limit their use, and that he was not permitted to remove, utilize, or disclose the Trade Secrets.  Zeng and Transpire's actions, therefore, were willful and malicious.

108.    Zeng utilized Lupin Inc.'s Trade Secrets and Confidential Information for personal gain and/or for the benefit of Transpire.

109.    Zeng and Transpire's actions constitute misappropriation of Lupin Inc.'s Trade Secrets.

110.    Zeng and Transpire have been unjustly enriched by their unlawful use of Lupin Inc.'s Trade Secrets, and Lupin Inc. is entitled to damages including, but not limited to, loss of profits due to Zeng and Transpire's unlawful diversion of business from Lupin Inc. to Transpire and disgorgement and the immediate return of all confidential information and Trade Secrets of Lupin Inc. in their possession, custody, or control.

111.    Zeng and Transpire's actions were taken in willful, wanton, and/or reckless disregard of Lupin Inc.'s rights and warrant the imposition of exemplary damages.

WHEREFORE, Lupin Inc.  demands the following:

(a)    injunctive relief preventing Zeng and Transpire from utilizing Lupin Inc.'s confidential and proprietary information and Trade Secrets, requiring the disgorgement and immediate return of all of Lupin Inc.'s confidential information and Trade Secrets in Zeng and Transpire's possession, custody, or control, and ordering Zeng and Transpire to surrender their devices and cloud storage accounts for a forensic examination;

(b)    attorneys' fees and costs incurred in bringing this action pursuant to applicable statutes including, but not limited to, Fla. Stat. § 688.005;

(c)    actual damages flowing from Zeng and Transpire's misappropriation of Lupin Inc.'s confidential information and Trade Secrets; and

(d)    all other remedies available at law or in equity as this Court deems just and appropriate.

## COUNT III – CONVERSION
### (Against Zeng)

112.    Lupin Inc. repeats and reasserts each and every allegation contained in paragraphs 1 through 93 of this Verified Complaint, as though fully set forth herein.

113.    Zeng surreptitiously took Lupin Inc.' confidential information and Trade Secrets without Lupin Inc.' knowledge or consent and, upon information and belief, provided the confidential information and Trade Secrets to Transpire.

114.    In so doing, Zeng improperly and without authorization exercised dominion and control over Lupin Inc.' confidential information and Trade Secrets.

115.    As a direct and proximate result of Zeng's conduct, Lupin Inc. has suffered and will continue to suffer damages in an amount to be determined at trial.

116.    Zeng's actions were willful and intentional, entitling Lupin Inc. to punitive damages, upon the filing of a proper motion.

117.    Lupin Inc has been required to retain legal counsel to prosecute this action and is entitled to recover their reasonable attorneys' fees and costs.

WHEREFORE, Lupin Inc. demands the following:

(a)    injunctive relief preventing Zeng from utilizing Lupin Inc.'s Confidential Information and Trade Secrets, and requiring the immediate return of all Lupin' confidential information and Trade Secrets  in Zeng's possession, custody, and/or control and ordering Defendants to produce their devices and cloud storage accounts for a forensic examination;

(b)    actual damages flowing from the conversion; and

(c)    all other remedies available at law or in equity as this Court deems just and appropriate.

### COUNT IV
### BREACH OF CONTRACT
### (Against Zeng)

118.    Plaintiff, LAHSA, realleges paragraphs 1 through 93 as if fully set forth herein.

119.    Defendant, Zeng, is party to an enforceable Agreement with LAHSA.

120.    Zeng's Agreement prohibited Zeng from soliciting, inducing, or influencing employees of Lupin or any of its affiliates to leave or alter their employment or a business relationship with Lupin or any of Lupin's affiliates.

CASE NO._____

121.    Zeng's Agreement also required Zeng to keep Lupin's information confidential and to refrain from disclosing, copying, or otherwise misappropriating Lupin's information.

122.    Zeng further agreed to return all Lupin property in his possession in the event of a termination of employment.

123.    Zeng breached the Agreement by directly and indirectly soliciting Lupin's employees within the one-year restrictive period without the company's prior written consent.

124.    Zeng breached the Agreement by retaining the external storage devices and Lupin's confidential and proprietary information after his employment with Lupin ended and failing to return same to Lupin at the termination of his employment.

125.    Zeng breached the Agreement by disclosing Lupin's confidential and proprietary information to Transpire.

126.    LAHSA is entitled to injunctive relief directing Zeng to cease his violations of the covenants of the Agreement as well as specific performance of the Agreement.

127.    LAHSA has suffered damages because of Zeng's breaches.

128.    LAHSA does not have an adequate remedy at law for the harm and damage which Zeng's breach of the Agreement has caused.

WHEREFORE, LAHSA demands the following:

 (a) injunctive relief enforcing the Agreement and enjoining any conduct that violates its
    terms,

(b) actual and consequential damages flowing from the breaches,

(c) attorney's fees and costs pursuant to the Agreement, and

(d) all other remedies available at law or in equity as this Court deems just and appropriate.

CASE NO._____

## COUNT V
## <u>BREACH OF FIDUCIARY DUTY</u>
### <u>(Against Zeng)</u>

129.     Plaintiffs reallege paragraphs 1 through 93 as if fully set forth herein.

130.     Pursuant to his relationship as an Executive Vice President, Zeng was under a fiduciary duty to act in the best interests of Plaintiffs, safeguard and protect Lupin's confidential and proprietary business information, and devote his full time and energy to Plaintiffs' business.

131.     By virtue of, *inter alia*, taking, using and disclosing Lupin's confidential and proprietary information and soliciting Lupin (and its affiliates) employees during and after his employment with Lupin, Zeng breached his fiduciary duty to Plaintiffs.

132.     As a direct and proximate result of Zeng's breach of his fiduciary duty, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial.

133.     Zeng's actions were willful and intentional, entitling Plaintiffs to punitive damages upon appropriate motion.

WHEREFORE, Plaintiffs demand the following:

(a) injunctive relief preventing Zeng from utilizing Lupin's Confidential Information and Trade Secrets, and requiring the immediate return of all Lupin's confidential information and Trade Secrets in Zeng's possession, custody, and/or control;

(b)     actual damages flowing from the breach of fiduciary duty; and

(c)     all other remedies available at law or in equity as this Court deems just and appropriate.

CASE NO._____

## COUNT VI
## CIVIL CONSPIRACY
## (against all Defendants)

134.    Lupin Inc. repeats and re-alleges Paragraphs 1 through 93 of this Verified Complaint as if set forth fully herein.

135.    Defendants are parties to a civil conspiracy and agreement to unfairly compete with Lupin.

136.    Upon information and belief, Perlwitz, Schachtner, Zeng, and Transpire conspired and agreed to use confidential information and trade secrets wrongfully obtained by Zeng from Lupin and to solicit Lupin's employees in order to give Transpire a competitive edge over Lupin.

137.    In the course of this civil conspiracy, Defendants committed several unlawful and overt acts, including misappropriating Lupin's confidential information and trade secrets and soliciting several Lupin employees to work for Transpire.

138.    Specifically, Defendants committed the following overt acts in furtherance of their conspiracy:

        a.  Zeng, with the knowledge of the other defendants, removed and disclosed confidential information and trade secrets from Lupin regarding Lupin's ongoing products;

        b.  Zeng, with the knowledge of the other defendants, misrepresented the true reasons for his departure from Lupin, in order to give Zeng an opportunity to continue to misappropriate Lupin's confidential information and trade secrets after he notified Lupin of his intention to resign his employment with Lupin;

CASE NO._____

> c.   Defendants induced Lupin's top scientists and executives to resign their employment with Lupin and to begin employment with Transpire, frustrating Lupin's ongoing projects; and
>
> d.   Zeng, Perlwitz, and Schachtner founded Transpire, a competing company to Lupin.  Perwitz and Schachtner were actively employed by Lupin and received substantial salaries from Lupin at the time they co-founded Transpire.

139.    As a direct and proximate result of Defendants' conspiracy against Lupin Inc., Lupin Inc. has suffered and will continue to suffer special damages specific to the civil conspiracy including, but not limited to, reputational damage and loss of goodwill due to Defendants' betrayal and the conspiracy itself.

140.    Defendants' conspiracy and their respective overt acts caused Lupin Inc. to suffer damages.

WHEREFORE, Lupin Inc. demands the following:

> (a)   injunctive relief preventing Defendants from utilizing Lupin's Confidential Information and Trade Secrets, and requiring the immediate return of all Lupin's confidential information and Trade Secrets in Zeng's and/or Transpire's possession, custody, and/or control;
>
> (b)   actual damages flowing from the civil conspiracy; and
>
> (c)   all other remedies available at law or in equity as this Court deems just and appropriate.

CASE NO._____

## COUNT VII
## <u>BREACH OF FIDUCIARY DUTY</u>
## <u>(Against Perlwitz and Schachtner)</u>

141.    Lupin Inc. reallege paragraphs 1 through 93 as if fully set forth herein.

142.    Pursuant to his relationship as Executive Director, Perlwitz was under a fiduciary duty to act in the best interests of Lupin, safeguard and protect Lupin's confidential and proprietary business information, and devote his full time and energy to Lupin' business.

143.    Pursuant to his relationship as Senior Director, Schachtner was under a fiduciary duty to act in the best interests of Lupin, safeguard and protect Lupin's confidential and proprietary business information, and devote his full time and energy to Lupin's business.

144.    By virtue of, *inter alia*, co-founding a competing business while employed by Lupin, Perlwitz and Schachtner breached their fiduciary duties to Lupin Inc.

145.    By virtue of, *inter alia*, facilitating Zeng's misappropriation of Lupin's confidential information and trade secrets and Transpire's use of same, Perlwitz and Schachtner breached their fiduciary duties to Lupin Inc.

146.    As a direct and proximate result of Perlwitz and Schachtner's breach of their fiduciary duty, Lupin Inc. has suffered and will continue to suffer damages in an amount to be determined at trial.

147.    Perlwitz and Schachtner's actions were willful and intentional, entitling Lupin to punitive damages upon appropriate motion.

WHEREFORE, Lupin Inc. demands the following:

(a)    injunctive relief preventing Perlwitz and Schachtner from utilizing Lupin Inc.' Confidential Information and Trade Secrets, and requiring the immediate return of all Lupin' confidential information and Trade Secrets in Perlwitz and

CASE NO._____

Schachtner's possession, custody, and/or control;

(b)    actual damages flowing from the breach of fiduciary duty; and

(c)    all other remedies available at law or in equity as this Court deems just and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in its favor and against Defendants as follows:

A.    Injunctive relief (including a preliminary injunction and permanent injunction) against Zeng and Transpire (i) enjoining them from retaining and/or using Lupin Inc.'s confidential information and Trade Secrets that they took and/or improperly obtained; (ii) directing them to return to Lupin Inc.'s confidential information and Trade Secrets in whatever form in which they exist in Defendants' possession; (ii) enjoining the transfer of Lupin's confidential information and Trade Secrets to any third party; (iii) requiring Defendants to identify all copies and all transfers of Lupin's confidential information and Trade Secrets, including the identity of any third party receiving or obtaining the confidential information and Trade Secrets or a copy thereof; (iv) prohibiting Defendants from misappropriating, using, or disclosing Lupin Inc.'s confidential information and Trade Secrets in their possession; and (v) enjoining Zeng from violating the restrictive covenant in his Agreement;

B.    An award of monetary damages in an amount to be determined at trial including;

C.    An award of exemplary damages.

D.    An award of attorneys' fees.

E.    An award of Plaintiffs' costs and expenses of this suit.

CASE NO._____

F.      Such other and further relief that the Court deems just and proper.


Dated: August 22, 2023.

                                  Respectfully submitted,

                                  JACKSON LEWIS P.C.
                                  One Biscayne Tower, Suite 3500
                                  2 South Biscayne Boulevard
                                  Miami, Florida 33131
                                  Telephone: (305) 577-7600

                        By:  *s/ Paul F. Penichet*
                                  Paul F. Penichet, Esq.
                                  Florida Bar No. 899380
                                  Email: *paul.penichet@jacksonlewis.com*
                                  Adam Schultz, Esq.
                                  Florida Bar No. 121111
                                  Email: *adam.schultz@jacksonlewis.com*

                                  *Counsel for Plaintiffs*