**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | |
|---|---|
| LUPIN ATLANTIS HOLDINGS SA, a foreign corporation, and LUPIN INC., a Delaware Corporation, | |
| Plaintiffs, | |
| v. | Case No.: 23-cv-61621-MD |
| XIAN-MING ZENG, TRANSPIRE BIO, INC., AXEL PERLWITZ, and WILLIAM SCHACHTNER, | |
| Defendants. | |

<u>**XIAN-MING ZENG'S CORRECTED MOTION FOR SUMMARY JUDGMENT ON COUNTS I, II, III, AND IV[1]**</u>

---

[1]   This Corrected Motion is filed to replace D.E. 203, as a result of inadvertent formatting and redaction issues.

Pursuant to Federal Rule of Civil Procedure 56, Defendant Xian-Ming Zeng ("Dr. Zeng") files this Motion for Summary Judgment on Counts I, II, III, and IV against him for Misappropriation of Trade Secrets under the DTSA, Misappropriation of Trade Secrets under the FUTSA, Breach of Contract, and Breach of Fiduciary Duty and states:

## I.   <u>PRELIMINARY STATEMENT</u>

Dr. Xian-Ming Zeng is a pioneer in the field of inhalation drugs, with decades of know-how. Lupin began recruiting Dr. Zeng in 2013. When Dr. Zeng joined Lupin, he proved invaluable. He used the knowledge developed over his career to lead Lupin's development of the first FDA-approved generic ("Gx") of ProAir HFA, the branded drug he launched at Teva. He also led the development of Lupin's Gx Spiriva Handihaler and was integral to Lupin's European launch of Luforbec, a generic ("Gx") version of Fostair. While at Lupin, Dr. Zeng worked on these and other drugs until his very last day at Lupin.[2]

To develop a generic, Lupin—or any pharmaceutical company—must follow public guidances published by the FDA, which inform it of how to create a product that is therapeutically equivalent to the reference listed drug. Lupin enjoyed success with its inhalation generics, but it never invested in what Dr. Zeng joined the company to do: develop novel drugs. Beginning around 2020, Lupin also began to suffer from a lack of research and development spending, global quality control issues at its manufacturing sites, and rapidly declining employee morale.

Consequently, Dr. Zeng left Lupin in 2021, and later became the first employee and CEO of Transpire Bio Inc. ("Transpire"), which was formed in April 2022. Since its creation, Transpire has continued to grow and eventually hired the other Defendants in this case (Axel Perlwitz and Bill Schachtner), months after its formation. ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[2]   D.E. 196, Defendants' Statement of Undisputed Material Facts ("SMF") Ex. 45 (Vanam Tr.) at 83:16-85:23.

███████████████████████████████████████████████████

████████████████████████████████████

Throughout this case, Lupin has blustered about "thousands" of documents that Dr. Zeng and two other Transpire employees retained when they left Lupin, but has failed and refused to define which portions of which of those documents it is claiming as its alleged "trade secrets." Lupin's scientific expert claims that only 252 of these documents contain trade secrets, but does not specify precisely what information in them is actually secret.[3] Lupin can only show that Dr. Zeng ever interacted with 14 of these 252 documents, none of which relate to any product that Transpire is currently developing. Lupin's failure to define its purported trade secrets with requisite particularity and inability to show that Dr. Zeng used them warrants summary judgment in his favor on Counts I and II.

Meanwhile, Plaintiffs cannot establish that Dr. Zeng was directly or indirectly involved in the solicitation of a single former Lupin employee in breach of his employment agreement (the "Agreement"). Only two of the nine disputed employees (Dr. Perlwitz and Mr. Schachtner) made initial contact with Transpire during Dr. Zeng's one-year non-solicitation period, which expired on October 1, 2022. Both of these individuals initiated the contact themselves, and, at Lupin's request, Dr. Perlwitz ultimately deferred his start date to October 6, 2022, to wrap up ongoing activities and allow the non-solicitation covenant to expire. (SMF ¶ 46).

Finally, Dr. Zeng had no duty to report to Lupin's Board the corporate opportunity Smoore approached Dr. Zeng with while he was at Lupin—combining vaping technology with inhalation drugs—which was technically unfeasible did not fit into Lupin's activities or strategic plans. (SMF ¶¶ 32-33; 37). Lupin's CEO testified that Lupin had no formal policies for disclosing corporate opportunities; employees are merely expected to use their discretion and not waste time on opportunities that do not accord with the company's strategic objectives, and Dr. Zeng did not report to the Board. (SMF ¶¶ 32-34, *id.* Ex. 1 (V. Gupta Tr.) 233:16-234:7). Moreover, Transpire is not pursuing this "opportunity" which Dr. Zeng testified is a medical impossibility. (SMF ¶ 37; SMF Ex. 5 (Zeng Tr.) 137:18-138:7). For similar reasons, Lupin cannot establish any damages

---

[3]   While Mr. Shafer alleges that there are 252 documents, some of those documents contain multiple files.  SMF ¶ 96.  In total, Mr. Shafer alleges that there are 257 files that are "trade secret." For this Motion, Defendants refer to the 252 unique documents identified by Mr. Shafer.

relating to this purported "opportunity" and is foreclosed from attempting to do so based on its failure to disclose any such damages theory in its initial disclosures or expert damages report.

## II.  BACKGROUND

### A.  Dr. Zeng's Background

Transpire is a pharmaceutical start-up company that develops inhalation medicines. (D.E. 31, Am. Compl. ¶ 16). Transpire is an indirect subsidiary of Smoore International Holdings Limited. SMF ¶ 36. Smoore is a global leader in electronic cigarette and vaping manufacturing. (D.E. 31 ¶ 4). Transpire has several generic and branded products in development, but has not yet obtained FDA approval for, marketed, or launched a single product. (SMF ¶ 66).

At Lupin, Dr. Zeng oversaw the drug development and FDA approval activities for Lupin's Coral Springs inhalation portfolio. (D.E. 31, Am. Compl. ¶¶ 47-48; SMF Ex. 1, V. Gupta Tr. 151:2-9; 50:22-24). Dr. Zeng was not a member of Lupin's Board of Directors and did not regularly participate in Board meetings. (SMF ¶ 24, *id.* Ex. 1 (V. Gupta Tr.) 217:5-24). He did not at any time report directly to the Board of Directors. *Id*. From 2013 until 2019, Dr. Zeng reported to Lupin's CEO, Vinita Gupta. From 2019 through the end of his employment with Lupin, Dr. Zeng reported to Alok Sonig, Global Head of Generics, R&D, and Biosimilars, who in turn reported to Ms. Gupta. (SMF Ex. 1 (V. Gupta Dep. Tr.) 217:25-218:5).

On April 20, 2021, Dr. Shi of Smoore contacted Dr. Zeng via email, stating:

> I am reaching out to experts like you in the medical inhalation device/drug formulation industry to explore potential collaborations, consulting, or recommendations of talents in the field to join us in our US R&D team. Smoore sees great potential to adapt and optimize the vaping technology and device in personal well-being and portable healthcare solutions as evidenced by the COVID epidemic.

(D.E. 31, Am. Compl. ¶ 58); (SMF Ex. 5 (Zeng Tr.) 120:3 – 120:14; SMF ¶ 30).

This kind of collaboration is not one Lupin has ever considered or investigated, and for good reason. (SMF Ex. 1 (V. Gupta Tr.) 234:9-236:17). As Dr. Zeng testified, this idea of combining vaping technology and inhaled medicines was "wishful thinking" and the medicines used to treat patients would be destroyed and degraded by a high temperature, not only losing its efficacy, but also producing many harmful chemicals. (SMF Ex. 5 (Zeng Dep Tr.) 20:18-25, 93:2-24). Despite Smoore's initial idea for collaboration being a dead-end, Dr. Zeng was ready for a

change in his career and continued his discussions with Smoore, in search of a personal opportunity to join Smoore as an executive. (SMF ¶ 35). He ultimately accepted employment with Smoore and moved to China, where he began his work on Smoore's behalf. *Id*. Dr. Zeng's last day at Lupin was October 1, 2021. *Id*. His employment agreement with Lupin GmbH (the "Agreement") contained a one-year non-solicitation covenant that expired on October 1, 2022. (SMF ¶¶ 20-22, 35).

Dr. Zeng returned to the United States in March 2022. *Id*. Transpire was incorporated in Florida on April 12, 2022. (SMF Ex. 8 (Transpire_0109727)); (SMF Ex. 5 (Zeng Dep. Tr.) 257:18-24).

In in the winter of 2021 Dr. Perlwitz began to seek new employment, applying to jobs at established pharmaceutical companies including Liquidia and Avalyn. (Ex. 21, Dr. Perlwitz's R&Os to Lupin's 1st Set of ROGs at 6). In March 2022, Dr. Perlwitz and Mr. Schachtner each reached out to Dr. Lepore, Transpire's Chief Medical Officer, who previously worked with Dr. Perlwitz and Mr. Schachtner at Lupin (SMF ¶¶ 40), inquiring about potential new career opportunities. SMF ¶¶ 41, 43. Spectrum Dynamic Research Corp. ("Spectrum"), an affiliate of Smoore International Holdings Ltd., subsequently offered them employment. SMF ¶¶ 42, 47. On May 11, 2022, Mr. Schachtner executed an Offer of Employment with Spectrum for the position of Chief Technical Officer, with a start date of July 1, 2022. SMF ¶ 42; SMF Ex. 14. Mr. Schachtner sent a resignation letter to Lupin on June 15, 2022, effective June 23. (SMF Ex. 14, Dr. Transpire's R&Os to Lupin's 2nd Set of ROGs at 16).

On or about May 23, 2022, Dr. Perlwitz informed Lupin that he intended to resign on July 1, 2022. *Id*. However, Lupin's President, Sofia Mumtaz, requested that he defer his start date until October 5, 2022. SMF Ex. 17, Lupin_0289674 at -676, -674; SMF Ex. 18, Mumtaz Dep. Tr. 58:15-62:21. This date was after the expiration of Dr. Zeng's non-solicitation period, and allowed for Dr. Perlwitz to remain at Lupin beyond the regulatory approval goal date for tiotropium bromide, a key Lupin milestone. (SMF Ex. 18 (Ex. 3 to Mumtaz Tr.; Mumtaz Tr. 59:15-61:25)). Transpire and Dr. Perlwitz mutually agreed on Lupin's requested solution. (SMF Ex. 18 (Ex. 3 to Mumtaz Tr.; Mumtaz Tr. 60:9-61:25)).

Between November 2022 and February 2023, Transpire hired seven other former Lupin employees whom Plaintiffs contend are relevant to this action: Thu Dao, Guizhen Huang, Vicmary Rodriguez Cruz, Marzena Sanquini, Barbra Santiago Colon, Greer Balladin, and Derek Kuhn.

SMF Ex. 10. None of these individuals were contacted or hired by Transpire before the expiration of Dr. Zeng's non-solicitation period on October 1, 2022. (SMF ¶¶ 49-59). Rather, in all instances, their first record contact with Transpire was November 2022 or later, and involved either the employees initiating contact with Transpire, or Transpire's head of Human Resources reaching out to them after expiration of Dr. Zeng's Agreement (though Transpire was not bound by it). (*Id.*; SMF Ex. 10).

B.      **Lupin's "Trade Secret Identification"**

Lupin has failed and refused to identify its trade secrets with meaningful specificity since from the outset of this litigation. The First Amended Complaint purported to define Lupin's trade secrets using only broad categorical descriptions and a handful of references to purported exemplar documents. Dkt. No. 31 ¶31. In its responses to interrogatories, Lupin cited 453 documents spanning 65,201 pages (*see* Appendix A, Documents 1-453), without identifying any specific information in any document that it was claiming as a trade secret. Instead, Lupin claimed that each document in its entirety corresponds to a trade secret. (SMF Ex. 34). Of these, Lupin's technical expert, identified 252 purportedly containing trade secrets—totaling more than 40,000 pages. See Appendix A, Documents #1-257. For virtually every document, Mr. Shafer's analysis followed the same boilerplate approach, essentially reciting that:

> The **document derives independent economic value from not being generally known to or readily accessible by another person using proper means who can obtain economic value from the disclosure or use of the information**. . . . **This type of document is not something that a company like Lupin would circulate externally without confidentiality protections in place** because it contains confidential information regarding, among other things, Lupin's drug product characteristics and analysis methods. **The document, as a whole, is a trade secret because it contains information such as drug characteristics and drug study results**. Lupin invested significant resources into the design and development of this study. **This information would be highly valuable to a competitor in the generic drug industry**, and in particular to a recent entrant into the industry attempting to quickly spin up drug product development and gain regulatory approval.

(SMF Ex. 3 at ¶ 258). Because Mr. Shafer is not qualified to speak about the content of the documents at issue (*see* Transpire's concurrently filed *Daubert* motion), he did not discuss what specific information within each document is not known to the public or how it derives economic

value from that fact.  During his deposition, Mr. Shafer was unable to identify the alleged trade secrets within each document or even how many trade secrets are at issue in his report:

> Q. **So how many trade secrets do you describe in your report?**  Is it the  number of documents you describe or something different?
> A. **I can't answer it.** . . .
> Q. Okay.  So I understand that you can count the number of documents.  **If we were to pull up one of these documents, are you able to also count the number of trade secrets within the document that you're identifying?**
> A. It would depend.  Not with – so certain things that are in there may be trade secret.  **No, the answer is that I would have to compare that to publicly available information in order to get an accurate number within the documents.**
> Q. Okay.  **And you haven't done that?**
>  A. No, **I have not done that.**

(SMF Ex. 47 (Shafer Tr.) at 141:3-143:17) (emphasis added).

Now, with trial merely three months away, Lupin has not provided any opinions identifying the specific alleged trade secret information within each document that Defendants have misappropriated.  This is in contravention of clear precedent from federal courts in this district, circuit and nation and means that Lupin has not presented allegations of misappropriated trade secrets warranting resolution by a jury.

C.  **Lupin's Misappropriation Claims Rely Heavily On Documents That Were NOT Acquired Or Accessed By Dr. Zeng.**

Defendants have also produced extensive discovery in this case, including  thousands of documents regarding Transpire's product development and 97 forensic artifact listings (across nine different devices) that provide detailed computer usage information. SMF Ex. 40, Kunkel Report, Tables 3-6.  Through that discovery, Lupin has been unable to show, in large part, anything more than passive possession on the part of Defendants.  In total, of the documents Mr. Shafer has identified as allegedly trade secret, Lupin can only show that 32 documents were ever opened by a Transpire employee  (Ex 40 Kunkel Report ¶ 55) and cannot show that Transpire's drug development used any trade secret information.  *See also* Ex. 47(Shafer Tr.) 188:24-189:2 ("My opinion is that the corpus of documents, alone or separately, we don't know how the information was used."); 193:13-25 ("It is impossible to determine exactly what and how all of the information that has been taken from Lupin has been used. [ ] it's not a worthwhile exercise . . . .we don't know exactly how all of it was used."). More than 75% of the documents Lupin's expert identifies as "trade secret" were last accessed on April 5, 2021, long before Transpire even existed and while

all the individual defendants were still Lupin employees.  Specifically, of the 252 documents Mr. Shafer identifies as "trade secret," 192 were found on a personal external hard drive ("My Passport Device") belonging to Dr. Perlwitz and were both created and last accessed on April 5, 2021.[4]  (Ex. 40, Kunkel Report ¶ 57).

### III.   ARGUMENT

A.   **LUPIN'S DTSA/FUTSA CLAIMS AGAINST DR. ZENG**

1.   <u>The Court Should Grant Summary Judgment Because Lupin Has Not Sufficiently Identified The Alleged Trade Secrets</u>

"A plaintiff seeking relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." *Portionpac Chemical Corp. v. Sanitech Systems, Inc.*, 217 F. Supp.2d 1238, 1252 (M.D. Fl. Jul. 25, 2002) (granting summary judgment of no trade secret misappropriation where plaintiff failed to sufficiently identify its trade secrets) "When a party fails to identify its trade secrets with particularity, summary judgment is appropriate." *Imax Corp.*, 152. F.3d at 1166; *see also Levenger Co. v. Feldman*, 516 F. Supp. 2d 1272, 1287 (S.D. Fla. 2007) (holding that a plaintiff "must describe the allegedly misappropriated trade secrets with reasonable particularity" and that plaintiff's misappropriation claim "fail[ed]" because the "alleged trade secrets are all extremely vague and attempts to clarify have been in vain") (Middlebrooks, J.). This is true even in instances where courts found plaintiff's identification adequate at the pleading or discovery stage. *See, e.g., Freeman Inv. Management Co., LLC v. Frank Russell Co.*, 2016 WL 5719819, at *9-12 (S.D. Cal. Sep. 30, 2016) (granting summary judgement for failure to sufficiently identify trade secrets where defendant had "repeatedly [unsuccessfully] challenged the sufficiency of Plaintiff's identification of its allegedly misappropriated trade secrets throughout this litigation.").

Here, the Court should grant summary judgment because Lupin has failed to identify what exactly their alleged trade secrets are, or how many trade secrets are at issue. This approach is contrary to well-established law that a document itself is not a trade secret.

  (a) *Lupin's Identification Of Documents "As A Whole" Does Not Satisfy Their Burden To Identify Their Trade Secrets*

---

[4]   Dr. Perlwitz has used his My Passport Device since 2007, before he was employed at Lupin. SMF Ex. 35, Faulkner Report, Appendix P.  Perlwitz's My Passport Device contained immense amounts of personal files and folders, including personal photos, audiobooks, and mp3 tracks. *Id.*

Lupin's current trade secret "identification" refers Defendants to 453 documents spanning 62,931 pages.  *See* Background, Section A. Hundreds of these documents (Appendix A, Documents #257-453) are not discussed in the expert report of Lupin's technical expert.  For these documents, Lupin's identification amounts to a mere listing of Bates Numbers in response to Transpire's Interrogatory No. 2.  *See* Background, Section A.  Those documents discussed in the expert report of Lupin's' technical expert (Documents #1-257) are on no better footing because Mr. Shafer's identification is also premised on the document "as a whole" being a trade secret. *See* Background, Section A. Lupin has never addressed how any specific drawing, process, procedure, or other piece of information in any of these documents qualifies as a trade secret.

Lupin's and Mr. Shafer's document "as a whole" theory fails as a matter of law. A "document itself cannot be a trade secret, although it may contain trade secrets." *Tao of Sys. Integration, Inc. v. Analytical Serv's. & Materials, Inc.*, 330 F. Supp. 2d 668, 678 (E.D. Va. 2004) aff'd, 141 F. App'x 129 (4th Cir. 2005).  Courts routinely grant summary judgment where, as here, a plaintiff fails to address how specific information in a document qualifies as trade secret. *See, e.g., Bunnell v. Motion Pictures Ass'n of America*, 567 F.Supp.2d 1148 (C.D. Cal. Aug. 22, 2007); *X6 Limited v. Li-Tek Corp. Company*, 2012 WL 12952726 (C.D. Cal. Aug. 27, 2012); *also Calendar Research LLC v. StubHub, Inc.*, 2020 WL 4390391, at *9 (C.D. Cal. May 13, 2020); *IDX Systems Corp. v. Epic Systems Corp.*, 165 F. Supp. 2d 812, 818 (W.D. Wisc. 2001), *aff'd in relevant part*, 285 F.3d 581 (7th Cir. 2005); *Weather Shield Mfg., Inc. v. Drost*, 2018 WL 3824150, at *2 (W.D. Wis. Aug. 10, 2018); *Utah Med. Prods., Inc. v. Clinical Innovations Assocs., Inc.*, 79 F. Supp. 2d 1290, 1313 (D. Utah 1999), aff'd, 251 F.3d 171 (Fed. Cir. 2000).

In *Zunum Aero, Inc. v. The Boeing Co.*, C21-0869JLR, 2024 WL 3822780 (W.D. Wash. Aug. 14, 2024), for example, the court vacated a $72 million jury verdict for trade secret misappropriation because, as a matter of law, the plaintiff Zunum failed to identify its trade secrets with particularity.   Like the cursory analysis in Mr. Shafer's expert report, the Zunum witnesses would introduce a document, discuss a few pages or excerpts, and testify that the trade secrets "would be in various places in our documents," which the court found deficient as a matter of law *Id*. at *5. Here, Lupin's identification is even more deficient as it fails to provide even this cursory analysis for hundreds of the documents it is identifying as an alleged trade secret.

      (b) *Lupin's Pivot To Broad Trade Secret Categories Does Not Satisfy Their Burden To Identify Their Trade Secrets*

Although Lupin and their technical expert have repeatedly claimed that "the document, as a whole, is a trade secret" SMF Ex. 3, (Shafer Op. Rep.) at ¶ 258), in response to Defendants' motion to narrow the number of trade secrets, Lupin recently departed from that identification and claimed that they were identifying only "nine trade secrets." Dkt. No. 187. In reality, Lupin's nine trade secrets merely refer to nine broad categories which are woefully insufficient for trade secret identification—which requires that particular information (*e.g.*, the particular design, procedure or data) be identified as trade secret: (1) Analytical Method Development and Validation, (2) Characterization Studies, (3) Statistical Analysis Plans (SAP) and Documentation, (4) Pre-Clinical and Clinical Study Protocols, (5) Pre-clinical and Clinical Study Reports and Other Documentation, (6) Pre-ANDA FDA Correspondence, (7) ANDA Submissions Content, (8) FDA Comments and Lupin Responses, and (9) Business Strategies.[5]  For instance, in *Del Monte Fresh Produce Co. v. Dole Food Co. Inc.*, 148 F. Supp. 2d 1322 (S.D. Fla. 2001), the court explained that a trade secret plaintiff must describe the trade secrets it seeks to protect with "reasonable particularity" and set forth a definition of reasonable particularity that precludes identification using broad categories. *Id.* at 1325-26. Judge Gold held that plaintiff's categorical identification, such as trade secrets in "pesticide and fungicide techniques," was insufficient because it did not identify the specific "aspect of Del Monte's pesticide and fungicide techniques" that qualified as trade secret. *Id.*  Several years later in *Knights Armament Co. v. Optical Systems Technology, Inc.*, 254 F.R.D. 463 (M.D. Fla. 2008), the plaintiff claimed that it had trade secrets in categories such as "manufacturing processes and procedures, marketing information, pricing data, product designs and manufacturing information, supplier and vendor lists, technical information, and technical drawings." *Id.* at 465. The court held that these broad categories did not satisfy the reasonable particularity standard because "it is insufficient to describe the trade secrets by generic category, such as the components of the night vision devices to which the alleged trade secrets relate." *Id.* at 467. "[Plaintiff] must identify the specific characteristics of each trade secret, such as a particular drawing, process, procedure or cost/pricing data." *Id.* at 467.  Courts continue to hold that these broad categorical descriptions do not sufficient to meet the plaintiffs' burden.  *See, e.g., United States Thrillrides, LLC and Polercoaster, LLC v. Intamin Amusement Rides Int. Corp. Est.*, No. 22-CV-2338, 2023 WL 11693750, *3 (M.D. Fla. Dec. 12, 2023) (holding that plaintiff's

---

[5]  Lupin's technical expert does not identify the categories each document falls into.

identification of its trade secrets as "engineering plans for the New Jersey and Orlando Polercoaster projects created by Intamin" was in fact "far too broad and too vague to identify trade secrets with any reasonable particularity"). Courts outside of Florida have taken the same approach. For instance, like Lupin, the plaintiff in *X6* identified several "categories" of alleged trade secrets (*e.g.*, "trade secrets related to the battery design criteria for Plaintiffs' active 3D shutter glasses"); *see also X6 Limited v. Li-Tek Corp. Company*, 2012 WL 12952726, at *6 (C.D. Cal. Aug. 27, 2012) (citing "hundreds of documents that purportedly 'reference or reflect the trade secret information disclosed to Li-Tek'" is insufficient).

The categories Lupin identifies correspond to a vague and generic type of information that exists in the field. For example, Lupin's identification of "Business Strategies" does nothing to identify the specific business strategies that Lupin is alleging as its trade secret. The same is true with Lupin's other categories. These broad descriptions do not identify the particular information within each document that Lupin contend is a trade secret, let alone in a manner that distinguishes that information from matters that are known or readily ascertainable (known or ascertainable business strategies, analytical methods, clinical studies or plans, ANDA submissions, etc.). The factfinder, the Court, and Defendants are thus without the precise identification that is needed to determine whether Lupin has met its burden to identify information that qualifies as a trade secret, whether that specific information was misappropriated, and the value (if any) of that information. A precise identification is critical in order for "the Court [to] ensure that only true trade secrets obtain protection." *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F.Supp.3d 222 (S.D.N.Y. Aug. 23, 2021). Here, Lupin has failed to meet its burden to provide that identification.

2.   The Court Should Grant Summary Judgment Because Lupin Cannot Establish The Existence Of Any Trade Secrets

Separate and apart from identifying its alleged trade secrets, Lupin also bears the burden of showing that each of the alleged trade secrets was not (i) "generally known" or (ii) "readily ascertainable by proper means." *See* Fla. Stat. § 688.002(4); 18 U.S.C. § 1839(3). Lupin has the burden of establishing each of these requirements "**as to each claimed trade secret**." *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1158 (11th Cir. 2004) (emphasis added); *Masimo Corp. v. True Wearables, Inc.*, 2022 WL 17083396, at *34–35 (C.D. Cal. Nov. 7, 2022) (analyzing elements as to each "Asserted Trade Secret[]"). Courts have been clear that in cases involving complex technology, these two elements can only be satisfied with expert testimony. *See*

*DropzoneMS, LLC v. Cockayne*, 2019 WL 7630788, at *11 (D. Or. Sept. 12, 2019) (holding that, "[w]ithout expert testimony separating source code that derives value from being secret from open-source and third-party source code, which does not, Lupin cannot establish the existence of a trade secret.") In this matter, Lupin has offered no admissible expert testimony establishing that the alleged trade secrets were not "generally known" or "readily ascertainable."

Lupin cannot meet its burden as to documents not discussed in Lupin's technical expert. (Appendix A, Documents #257-453). Even for the documents described in Mr. Shafer's expert report (Documents #1-252), Lupin does not have admissible expert testimony establishing that the alleged trade secrets actually qualify as trade secrets. <u>First</u>, Lupin's technical expert admitted that he did not analyze whether information in the documents he cites is generally known. Ex. 47 (Shafer Tr.) at 48:14-49:4. <u>Second</u>, Mr. Shafer's expert report merely repeats the following boilerplate statement for 176 of the 252 documents he discusses in his report: "The document derives independent economic value from not being generally known to or <u>readily accessible</u> by another person using proper means who can obtain economic value from the disclosure or use of the information." (SMF Ex. 3 (Shafer Rep.) ¶ 154). Of course, the actual term from the statute is "readily ascertainable," which Mr. Shafer, by his own admission, did not address.[6] (*See also* Ex. 47 (Shafer Tr.) at 308:12-19). In addition, as explained in Transpire's concurrent *Daubert* motion, Mr. Shafer's conclusory statements fail to meet the threshold standards articulated in *Daubert* and its progeny. <u>Third,</u> for 77 of the 252 documents discussed in his report, Mr. Shafer does not even opine that the information within the document is not "readily ascertainable."

Courts routinely grant summary judgment where a plaintiff fails to offer expert testimony establishing the existence of "trade secrets." *Seshadri Raju, M.D., P.A. v. Medtronic, Inc.*, 2021 WL 1232102, at *9 (S.D. Miss. Mar. 31, 2021) ("[A]s a matter of law, [plaintiff's] failure to present an expert precludes him from establishing whether this information is readily ascertainable[.]"); *Trident Products and Services, LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F.Supp.2d 771, 779 (E.D. Va. April 12, 2012) (granting summary judgment to defendant given "plaintiff's failure to identify an expert witness" to opine on "readily ascertainable" element); *Hill v. Best Med. Int'l, Inc.*, 2011 WL 5082208, at *14 (W.D. Pa. Oct. 25, 2011) (same).

---

[6] Defendants believe that this "ascertainable" vs. "accessible" distinction in Shafer's report was purposeful, as it ties to Lupin's document-as-a-whole theory discussed above.

11

3.     The Court Should Grant Partial Summary Judgment Of No Misappropriation By Dr. Zeng
As To Documents That Were Not Acquired By Dr. Zeng

To establish that Transpire or Dr. Zeng misappropriated these "trade secrets," Lupin must show one of two categories of conduct: (1) that Transpire or Dr. Zeng acquired each trade secret by improper means, or (2) that Transpire or Dr. Zeng disclosed or used each trade secret without consent. The Court should thus grant partial summary judgment of no misappropriation by Dr. Zeng as to document that were not acquired, disclosed or used by Dr. Zeng.

Of the 257 documents identified as an alleged trade secret by Mr. Shafer, only 15 of these documents are located on devices for which Dr. Zeng is a custodian. *See* App'x A. The remaining documents discussed by Mr. Shafer were found on devices that do not belong to Dr. Zeng. Specifically, 214 of the 257 documents discussed by Mr. Shafer were located on devices of Dr. Axel Perlwitz and another 28 documents were located on the devices of Mr. Thu Dao. The record is devoid of any evidence that Dr. Zeng acquired, disclosed or used documents located on the devices of Dr. Perlwitz or Mr. Dao. *See Del Monte Fresh Produce Co. v. Dole Food Co., Inc*., 148 F. Supp. 2d at 1338 ("[m]isappropriation of trade secrets is an intentional tort" and "[a]s such, [Lupin] must show more than mere possession of a trade secret by" the defendant to establish misappropriation). Thus, the Court should grant summary partial summary judgment of no misappropriation by Dr. Zeng as to documents not located on Dr. Zeng's devices.

B.     **DR. ZENG DID NOT BREACH THE NON-SOLICITATION AGREEMENT.**

Plaintiffs cannot establish that Dr. Zeng directly or indirectly solicited any Lupin employees during the one-year non-solicitation period. (*See* D.E. ¶ 129). The Agreement provides, "during your employment with the Company and for one year thereafter, you will not, without the Company's prior written consent, attempt to, directly or indirectly, (i) employ, solicit for employment, or recommend for employment any person employed by the Company (or any of its affiliates)…" (D.E. 31-1 ¶ 5). Dr. Zeng's last day at Lupin was no later than October 1, 2021, so his non-solicitation obligations expired on October 1, 2022. (SMF ¶ 35). Only two of the disputed former Lupin employees were hired within this period, Defendants Axel Perlwitz and William Schachtner. (SMF ¶¶ 41-58). It is undisputed that the remaining employees were hired after the expiration of the non-solicitation clause, and there is no evidence that Dr. Zeng made any contact with these individuals or was involved in any efforts to recruit them prior to October 1, 2022. Those employees and their start dates and first contact with Transpire are as follows:

1) Thu Dao: Mr. Dao started at Transpire on or about December 19, 2022. His first contact with Transpire was a LinkedIn message from Transpire's Head of Human Resources, Brad Tompkins, on November 11, 2022. Mr. Dao applied for a posted position with Transpire in November 2022. He accepted employment with Transpire on or about December 9, 2022. (*Id.* ¶ 49).

2) Guizhen Huang: Ms. Huang started at Transpire on or about January 6, 2023.[7] She had a call with Mr. Tompkins on November 4, 2022. She applied for a posted position with Transpire that month. She accepted employment with Transpire on or about December 7, 2022. (*Id.* ¶ 50).

3) Vicmary Rodriguez Cruz: Ms. Cruz started at Transpire on or about January 9, 2023. Her first contact with Transpire was an email she sent to Dr. Zeng on November 15, 2022, explaining that she was looking to upgrade her professional situation." She applied for a posted position with Transpire that same month. She accepted employment with Transpire on or about December 8, 2022. (*Id.* ¶ 51).

4) Marzena Sanquini: Ms. Sanquini started at Transpire on or about January 9, 2023. She applied for a posted position with Transpire in November 2022. Her first contact with Transpire was an email from Mr. Tompkins on November 11, 2022. She accepted employment with Transpire on or about December 14, 2022. (*Id.* ¶ 52-53)

5) Barbra Santiago Colon: Ms. Colon started at Transpire on or about January 16, 2023. Her first contact with Transpire was on November 18, 2022, when she applied for an open Transpire job listing for "Senior Scientist 1." Ms. Santiago Colon accepted employment with Transpire on or about December 22, 2022. (*Id.* ¶ 54-55)

6) Greer Balladin: Ms. Balladin started at Transpire on or about February 6, 2023. Her first contact with Transpire was a LinkedIn message from Mr.Tompkins on November 1, 2022.  Ms. Greer Balladin applied for a posted position with Transpire in December 2022. Ms. Greer Balladin accepted employment with Transpire on or about December 24, 2022. (*Id.* ¶ 56-57).

7) Derek Kuhn: Mr. Kuhn started at Transpire on or about February 20, 2023. His first contact with Transpire was on November 18, 2022. Two months later, on January 18, 2023, Mr. Kuhn sent his resume to Transpire for consideration. Mr. Kuhn accepted employment with Transpire on or about January 30, 2023. (*Id.* ¶ 58).

 (SMF ¶¶ 41-58).

Plaintiffs' claims fail as a matter of law as to these employees, as Plaintiffs can provide no evidence that any agent of Transpire made any contact with them within the non-solicitation

---

[7]  SMF Ex. 10 Transpire's Responses and Objections to Plaintiffs' Second Set of ROGs at 10.

period, much less, that Dr. Zeng solicited them (directly or indirectly) during that time. Rather, the record shows that these employees either reached out to Transpire in search of a better professional opportunity, or that Mr. Tompkins reached out to them after Dr. Zeng's non-solicitation obligations had terminated.

  <u>Dr. Perlwitz</u>:  There is no evidence that Dr. Zeng directly or indirectly solicited Dr. Perlwitz, whose first day at Transpire was several days after the non-solicitation covenant expired, per Lupin's request.[8] On March 22, 2022, Dr. Perlwitz initiated contact with Transpire by emailing Dr. Mark Lepore, Transpire's Chief Medical Officer, stating "I have made the decision that it is time to move on to a new endeavor…If you become aware of any leads you may think could be interesting, please do let me know." There is no evidence that Dr. Zeng encouraged this contact or was otherwise involved in soliciting Dr. Perlwitz.[9] *See Comerica Bank v. Hill*, 2010 WL 2854174, at *2 (M.D. Fla. July 21, 2010) (holding that plaintiff was not likely to prevail on solicitation claim where defendants did not make the initial contact with plaintiff's clients and did not proactively solicit their business, but rather, accepted it, after the clients "made the decisions to transfer the business for their own individual reasons."); *Strategic Staffing Solus., Inc. v. O'Donohue*, 2006 WL 8433056 (M.D. Fla. Jan. 6, 2006) (solicitation requires "proactive steps" and does not disallow acceptance of the active advances of others).[10]

  Further, even if Lupin could establish that Dr. Perlwitz's outreach was somehow prompted by Dr. Zeng, Lupin's agreement with Dr. Perlwitz and Transpire to defer Dr. Perlwitz's start date until after the expiration of the non-compete period equitably estops Lupin from asserting a claim for breach of the Agreement on this basis. When Dr. Perlwitz informed Lupin that he intended to resign, effective July 1, 2022, Lupin's President, Sofia Mumtaz, called Dr. Zeng and requested that Dr. Perlwitz's start date be deferred until October 5, 2022, after the expiration of the non-solicitation period, which also allowed Dr. Perlwitz to be there at the regulatory approval goal date for tiotropium bromide. Transpire, Axel, and Lupin all agreed to this solution. Consequently, Lupin is equitably estopped from asserting damages against Transpire based on the alleged solicitation

---

[8] Lupin_0289674 at -676, 674. (SMF Ex. 18 (Mumtaz Tr.) 58:15-62:21).

[9] J. Vieira Deposition Tr. 239:3-239:17.

[10] *See also Massey Servs., Inc. v. Sanders*, 312 So. 3d 209, 215 (Fla. 5th DCA 2021) ("The mere fact that an employee, who is planning to leave his employment to work for a competitive company, has a conversation with a fellow employee about whether the fellow employee will consider a job with the same competitor, does not amount to solicitation[.]").

of Dr. Perlwitz. Equitable estoppel is "applicable in all cases where one, by word, act or conduct, willfully caused another to believe in the existence of a certain state of things, and thereby induces him to act on this belief injuriously to himself, or to alter his own previous condition to his injury." *See United Auto. Ins. Co. v. Chiropractic Clinics of S. Fla., PL*, 322 So. 3d 740, 743 (3d DCA June 2021). Having indicated that it was in agreement with Dr. Perlwitz joining Transpire outside of the non-solicitation period, Lupin cannot now be heard to complain of the very arrangement it requested. *Id.;* SMF Ex. 18*, Mumtaz Tr.* 60:9-61:25, 69:6-71:1.

William Schachtner: Plaintiffs also cannot demonstrate that Dr. Zeng solicited Mr. Schachtner. Mr. Schachtner initiated contact with Transpire on March 22, 2022 via email to Dr. Mark Lepore, stating "I'm looking for other career options to better suit my skills. If you have any ideas or know of some company that might have opportunities, I would appreciate any feedback." There is no evidence that Dr. Zeng in any way facilitated this communication.

C.      **DR. ZENG DID NOT BREACH ANY FIDUCIARY DUTY TO LUPIN.**

In Florida, a breach of fiduciary duty requires the: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach." *See Hill v. Nagpal*, 2013 WL 246746, at *3 (S.D. Fla. Jan. 22, 2013). Plaintiffs allege that Dr. Zeng breached his duty of loyalty: by 1) soliciting former Lupin employees to work at Transpire in breach of the Agreement, and 2) usurping an opportunity that Smoore approached Dr. Zeng with while he was at Lupin to collaborate to combine vaping technology with inhaled medicines, an opportunity Transpire is not pursuing.[11] Both claims fail, as a matter of law.

1.      **Dr. Zeng's Non-Solicitation Obligations were Governed by the Agreement, which was not Breached.**

Any fiduciary duty that Dr. Zeng owed to Lupin ended when his employment ceased. *See Optio Rx, LLC v. Crestview City Pharmacy, Inc*., 2023 WL 11762870, at *4 (N.D. Fla. June 16,

---

[11] (D.E. 31 ¶¶ 57-58, 137-38). Plaintiffs' allegation that Dr. Zeng had a fiduciary duty to "devote his full time and energy to Plaintiffs' business" finds no legal support; this is not part of an officer's duty of care or loyalty. *Taubenfeld v. Lasko*, 324 So. 3d 529, 538 (Fla. 4th DCA 2021) (D.E. 31 ¶ 136). Plaintiffs also cannot rely on the undefined phrase "among other things" to expand their breach of fiduciary duty claim beyond the solicitation and corporate opportunity issues alleged. However, Plaintiffs note that any claim related to disclosure of confidential information would be precluded by the independent tort doctrine, as the confidentiality obligations were defined by contract and Plaintiffs have asserted a claim for breach of the confidentiality agreement (Count III). *Perez v. Scottsdale Ins. Co.*, 2020 WL 607145, at * 2 (S.D. Fla. Feb. 7, 2020).

2023).  Any potential restriction on Dr. Zeng soliciting Lupin employees after he left Lupin therefore existed only as a matter of contract law. Transpire's hiring of former Lupin employees does not support a breach of Dr. Zeng's contractual non-solicitation obligations. Further, the independent tort doctrine bars plaintiffs from seeking relief for this same conduct in tort. *See Perez v. Scottsdale Ins. Co.*, 2020 WL 607145, at * 2 (S.D. Fla. Feb. 7, 2020) ("The independent tort doctrine bars recovery in tort for actions that challenge a breach of contract[.]"); *Springboard Media, LLC v. Augusta Hitech Soft Solutions, LLC*, 2022 WL 18465128, at *2 (S.D. Fla. June 14, 2022) (dismissing breach of fiduciary duty claims which failed to allege conduct or facts independent of defendant's breach of the underlying contract); *BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1353 (S.D. Fla. 2021) (dismissing fraudulent and negligent misrepresentation claims that relied on the same alleged conduct, and sought relief for the same alleged damages, as the plaintiff's breach of contract claim); *see also Optio*, 2023 WL 11762870, at *4 (finding plaintiff corporation unlikely to succeed on merits of breach of duty of loyalty claim where record "reflect[ed] that there was a mass resignation of employees" but there was "no evidence" the defendants made job offers); *Harllee v. Prof'l Serv. Indus., Inc.*, 619 So.2d 298 (Fla. 3d DCA 1992) (duty of loyalty was not breached where there was no "direct evidence" to show former employee recruited 57 people from former employer).

2.    **Lupin Cannot Establish that Dr. Zeng Breached his Fiduciary Duty Based on the Alleged Smoore Opportunity.**

i.    Plaintiffs Cannot Establish the Existence or Usurpation of a Corporate Opportunity.

Plaintiffs' claim for breach of fiduciary duty requires them to show that Dr. Zeng "exploit[ed], for his [ ] own profit, a beneficial opportunity that rightly belongs to the corporation." *See Summerland Key Cove Park, LLC v. Murphy*, 321 So. 3d 888, 894 (Fla. 3d DCA 2021). This requires, in the first instance, that: "(1) there was a business opportunity, (2) that the corporation [was] financially capable of undertaking, and (3) this opportunity fit into the present activities of the corporation or into an established corporate policy that acquisition of the opportunity would forward." *Id*.; *In re Morris*, 2018 WL 2165767, at *4 (Bankr. M.D. Fla. May 8, 2018). Lupin's corporate opportunity claim fails at the outset because the "opportunity" Smoore approached Dr. Zeng with, indisputably, did not fit into Lupin's activities. Lupin did not submit expert testimony on liability or damages associated with this claim. Lupin's articulation of the claim came in the Amended Complaint, which alleges the opportunity related to a collaboration "to combine

Smoore's e-cigarette technology with Lupin's knowhow and experience in the inhaled medication industry" to "adapt and optimize" vaping technology to deliver inhaled medicines. (D.E. 31 ¶¶ 57-59, 137). As Lupin's CEO admitted in her deposition, Lupin has never engaged in—nor does it plan to engage in—a business that combines inhalation medicine with vaping technology:

> Q. During your time at – as the CEO of Lupin, has the company ever considered pairing its inhalation products with vaping technology?
> A. Not that I recall.
> ….
> Q. Is Lupin currently interested in pairing its inhalation products with vaping technology?
> A. I don't know[.]
> Q. Do you have a view as to whether that would be a promising business?
> A. I really don't know what it would entail and what it could do
> . . . .
> Q. Has Lupin ever considered partnering with any other vaping companies for the purpose of adapting vaping technology to inhalation drugs?
> A. Not that I can recall.

(Ex. 1 to SMF, Gupta Tr. 234:9-236:17) (objections omitted).

It is not surprising that Lupin has never pursued this supposed "opportunity." Vaping technology relies on a heating element that would destroy the inhalation medicine and produce harmful chemicals.  (Ex. 5 to SMF, Zeng Tr. at 19:14-21:5).  It is therefore incompatible with inhalations drugs and does not "fit into the … activities" of a pharmaceutical company like Lupin. *Summerland*, 321 So. 3d at 894. For this same reason, Dr. Zeng has not exploited the opportunity for his own benefit and does not intend to. *Id*. He testified that it is not scientifically feasible to combine vaping technology with inhaled medicines and the concept was "wishful thinking" on Smoore's part— he talked Smoore out of it. Ex. 5 to SMF, Zeng Tr. at 19:14-21:5, 93:2-24.

ii. Plaintiffs Cannot Establish that Dr. Zeng Owed a Duty to Disclose the "Opportunity."

Plaintiffs allege that Dr. Zeng breached his fiduciary duty by failing to disclose the alleged opportunity to Lupin's Board of Directors. (D.E. 31 ¶¶ 5, 62). However, the undisputed facts show that he had no such duty. Lupin has no formal policies concerning the assessment or reporting of potential opportunities, including any requirement that they be reported to the Board. (SMF ¶ 32, *id.*; Ex. 1 (V. Gupta Tr.) 229:25-233:7).  Rather, Lupin's CEO testified that employees approached with a potential corporate opportunity are expected to exercise sound discretion and to assess

whether the opportunity is "strategic fit to the priorities that are laid down by the company," and to not "waste time" if they are not. (SMF ¶ 34, *id.* Ex. 1 (V. Gupta Tr.) 233:16-234:7). Because reporting potential opportunities was discretionary, Dr. Zeng had no duty to report Smoore's approach.[12] Further, Dr. Zeng was not a member of Lupin's Board of Directors and did not report to the Board or attend Board meetings. (SMF Ex. (V. Gupta Tr.) 217:5-2183:3). Dr. Zeng's superior, Alok Sonig, to whom he reported, only discretionarily reported select opportunities that "made sense to present to the Board." (*Id*. 241:9-18).[13]

    iii.    <u>Plaintiffs Have Offered No Damages Resulting from the Alleged Loss of Opportunity.</u>

    The corporate opportunity claim also fails based on Plaintiffs' failure and inability to identify any related damages. *Riverside Apartments of Cocoa, LLC v. Landmark Am. Ins. Co.*, 505 F. Supp. 3d 1293, 1309 (M.D. Fla. 2020) ("The profits from a lost business opportunity must be probable, not merely possible."). Plaintiffs' Third Amended Rule 26(A)(1) Disclosures do not provide any computation of damages with respect to the alleged loss of corporate opportunity. SMF Ex. 44. These disclosures simply refer to the opening expert report of Plaintiffs' damages expert, Dawn Hall, who did not provide any damages model or estimate (or any other opinions) with respect to any possible damages from the alleged loss of corporate opportunity. This is fatal for two reasons; first, because a failure to timely compute damages in initial disclosures bars a party from presenting evidence of such damages. *See Browning v. Bay Radiology Assocs. PL*, 2024 WL 3200472, at *2 (11th Cir. June 27, 2024); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 288 (2d Cir. 2006); *A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333, 1347 (S.D. Fla. 2021); *Nymbus, Inc. v. Chrome Fed. Credit Union*, 2021 WL 8894791, at *7 (S.D. Fla. 2021). Second, these damages (*i.e.*, the profits that Plaintiffs contend would have flowed from the corporate opportunity, had it been realized) require expert opinion, which Plaintiffs have not offered, and which would be impermissibly speculative, in any event. *See, e.g., Alphamed Pharms. Corp. v. Arriva Pharms*., Inc., 432 F. Supp. 1319, 1351 (S.D. Fla. 2006), aff'd, 294 F. App'x

---

[12]  Dr. Zeng's testimony confirms that the purported opportunity would not have been a strategic fit for Lupin, and would have wasted time, as it is not scientifically viable. Ex. 5 to SMF 93:2-24.

[13]  Lupin's CEO does not know whether Dr. Zeng ever told anyone at Lupin about Smoore reaching out to him, and Dr. Zeng testified that he did. (SMF Ex. 1, Gupta Tr.  242:19-21; Ex.5, Zeng Tr. 88:5-89:23, 97:13-92:11). No evidence refutes his testimony in this regard. *See In re Pervis*, 512 B.R. 348, 369 (Bankr. N.D. Ga. 2014) ("No breach occurs if the officer specifically informs the corporation of the new business opportunities and the corporation declines to take them.").

501 (11th Cir. 2008) (plaintiff's expert opinion could not support lost profit damages because plaintiff failed to prove the underlying "but for" assumptions concerning its business plan); *River Bridge Corp. v. Am. Somax Ventures ex rel. Am. Home Dev. Corp.*, 18 So. 3d 648, 651 (Fla. 4th DCA 2009) (expert opinion was too speculative to support claimed lost profits based on "the number of houses built by the other homebuilders" without "even knowing whether they made a dime of profit"); *In re Janssens*, 449 B.R. 42, 74 (Bankr. D. Md. 2010) ("in the absence of expert testimony" plaintiff failed to substantiate a proper basis for the court to calculate lost profit damages based on diversion of corporate opportunity).[14]

Any damages Plaintiffs may try to establish in connection with this claim hinge upon a speculative series of unprovable assumptions for which Plaintiffs have offered no evidence at all: 1) that Plaintiffs would have actually pursued the opportunity; 2) that Plaintiffs and Smoore would have reached an agreement to collaborate; 3) that the collaboration would have achieved its intended purpose (successfully combining vaping technology with inhaled medicines); and 4) the endeavor would have been profitable. *See* SMF, Ex. 1 (V. Gupta Tr.) 233:8-15 (testifying that of the many opportunities that come to Lupin, "a small percentage [ ] ultimately make it through."). These speculative assumptions cannot defeat summary judgment. *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1177 (11th Cir. 2002) (damages may not be awarded for lost profits when those profits are dependent on a party taking an action that it is unclear he would have taken); *Asokan v. Am. Gen. Life Ins. Co.*, 2017 WL 4535065, at *2 (M.D. Fla. Aug. 24, 2017) ("Missed investment opportunities are analyzed under Florida's law regarding lost profits," which cannot be "too speculative, or [ ] dependent of changing circumstances"); *SMS Audio, LLC v. Belson*, 2017 WL 11631378, at *2 (S.D. Fla. Apr. 25, 2017) (granting judgment as a matter of law because the plaintiff "must take a series of steps" before entering the relevant market, and the evidence showed that those prerequisite conditions were uncertain to occur); *Bergeron v. Ridgewood Sec. Corp.*, 610 F. Supp. 2d 113, 137 (D. Mass. 2009) (granting summary judgment in favor of defendant based on plaintiff's failure to show that its funds were capable of participating in the alleged

---

[14] *See also Alcatel USA, Inc. v. Cisco Sys., Inc.*, 239 F. Supp. 2d 660, 670–72 (E.D. Tex. 2002); *In re Edmonds*, 2019 WL 4780921, at *7 (Bankr. N.D. Tex. Sept. 30, 2019) *Bass Venture Corp. v. Devom*, LLC, 342 So. 3d 821, 824 (Fla. 2d DCA 2022); *Montage Grp., Ltd. v. Athle-Tech Computer Sys., Inc.*, 889 So. 2d 180, 195 (Fla. 2d DCA 2004).

corporate opportunity, or that it was in their interests to do so); *Keg Techs., Inc. v. Laimer*, 436 F. Supp. 2d 1364, 1378 (N.D. Ga. 2006); *In re Janssens*, 449 B.R. 42, 73 (Bankr. D. Md. 2010).

Indeed, Plaintiffs' assumptions are readily refuted by the testimony of Lupin's CEO, who testified that: 1) she is not aware of any investigation or diligence ever conducted by Lupin to determine whether it is possible to adapt its inhalation business to vape technology; 2) she does not know whether this would be realistic, feasible, or promising; 3) she is not aware of any other company announcing or launching a vape-based inhalation drug; 4) Lupin has still never explored this possibility, despite there being no obstacles to it doing so;  and 5) Lupin never reached out to Smoore after learning of its advance to attempt this collaboration (which Transpire is not pursuing). (Ex. 1 to SMF, Gupta Tr. 234:9-239:21). Meanwhile, Dr. Zeng, an undisputed expert in the inhalation industry, testified that "vaping technology is not suitable for delivering inhalation medicines because it could degrade the molecules leading to toxic effect" and "there is no FDA guidance about vaping technology to develop inhalation medicines." (Ex. 5 to SMF, Zeng Tr. 93:2-24). Lupin has offered no expert opinion to the contrary, which would also be necessary to establish damages flowing from the purported "loss" of this opportunity. Lupin's acknowledgement that it still has never seriously considered the opportunity Smoore approached Dr. Zeng with (which Transpire is not pursuing), coupled with Dr. Zeng's undisputed testimony that this could not be accomplished, negates any possibility that Lupin was damaged by Dr. Zeng's alleged failure to disclose this opportunity. *See C & B Sales & Serv., Inc. v. McDonald*, 95 F.3d 1308, 1315 (5th Cir. 1996) (plaintiff failed to show that it would have pursued lost corporate opportunities).

## IV.   CONCLUSION

Defendant Xian-Ming Zeng respectfully requests entry of an Order granting summary judgment in favor of Defendant and against Plaintiffs with respect to Counts I, II, III and IV (Misappropriation of Trade Secrets Under DTSA, Misappropriation of Trade Secrets under FUTSA, Breach of Contract, and Breach of Fiduciary Duty) and any other relief as the Court deems just and proper.

Dated: March 12, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

/s/ *Samuel G. Williamson*

Samuel G. Williamson
Florida Bar No. 1033817
samuelwilliamson@quinnemanuel.com
Shalia M. Sakona
Florida Bar No. 107398
shaliasakona@quinnemanuel.com
Olivia A. Barket Yeffet
Florida Bar No. 1026382
oliviayeffet@quinnemanuel.com
David M. Walsh
Florida Bar No. 1048823
davidwalsh@quinnemanuel.com
2601 South Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880

Jared Newton (admitted *pro hac vice*)
jarednewton@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, DC 20005

Nima Hefazi (admitted *pro hac vice*)
nimahefazi@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

Andrew G. Shifren (admitted *pro hac vice*)
andrewshifren@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, New York 10016
(212) 849-7181

Jocelyn Ma (pending *pro hac vice*)
jocelynma@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document is being filed on

March 12, 2025, and served on all counsel of record on the Service List attached via transmission

of Notice of Electronic Filing generated by CM/ECF.

/s/   *Samuel G. Williamson*
Samuel G. Williamson
Florida Bar No. 1033817
samuelwilliamson@quinnemanuel.com

## APPENDIX A

| Document No. | Bates Number | Custodian | No. of Pages |
|---|---|---|---|
| 1 | Transpire_0041200 | Perlwitz, Axel | 99 |
| 2 | Transpire_0041299 | Perlwitz, Axel | 87 |
| 3 | Transpire_0041386 | Perlwitz, Axel | 3 |
| 4 | Transpire_0081585 | Perlwitz, Axel | 165 |
| 5 | Transpire_0081883 | Perlwitz, Axel | 165 |
| 6 | Transpire_0082054 | Perlwitz, Axel | 66 |
| 7 | Transpire_0082121 | Perlwitz, Axel | 63 |
| 8 | Transpire_0084643 | Perlwitz, Axel | 41 |
| 9 | Transpire_0070541 | Perlwitz, Axel | 124 |
| 10 | Transpire_0057253 | Perlwitz, Axel | 63 |
| 11 | Transpire_0057191 | Perlwitz, Axel | 62 |
| 12 | Transpire_0065568 | Perlwitz, Axel | 156 |
| 13 | Transpire_0067307 | Perlwitz, Axel | 50 |
| 14 | Transpire_0008439 | Perlwitz, Axel | 5552 |
| 15 | Transpire_0059117 | Perlwitz, Axel | 138 |
| 16 | Transpire_0060271 | Perlwitz, Axel | 5 |
| 17 | Transpire_0008295 | Perlwitz, Axel | 55 |
| 18 | Transpire_0028016 | Perlwitz, Axel | 30 |
| 19 | Transpire_0000556 | Perlwitz, Axel | 46 |
| 20 | Transpire_0000911 | Perlwitz, Axel | 4 |
| 21 | Transpire_0023276 | Perlwitz, Axel | 14 |
| 22 | Transpire_0023031 | Perlwitz, Axel | 92 |
| 23 | Transpire_0008350 | Perlwitz, Axel | 3 |
| 24 | Transpire_0000549 | Perlwitz, Axel | 7 |
| 25 | Transpire_0085590 | Perlwitz, Axel | 53 |
| 26 | Transpire_0030779 | Perlwitz, Axel | 97 |
| 27 | Transpire_0030876 | Perlwitz, Axel | 38 |
| 28 | Transpire_0000543 | Perlwitz, Axel | 6 |
| 29 | Transpire_0000602 | Perlwitz, Axel | 8 |
| 30 | Transpire_0023224 | Perlwitz, Axel | 6 |
| 31 | Transpire_0343880 | Perlwitz, Axel | 5 |
| 32 | Transpire_0044228 | Perlwitz, Axel | 19 |
| 33 | Transpire_0056960 | Perlwitz, Axel | 12 |
| 34 | Transpire_0344065 | Perlwitz, Axel | 52 |
| 35 | Transpire_0344242 | Perlwitz, Axel | 3 |
| 36 | Transpire_0344637 | Perlwitz, Axel | 9 |
| 37 | Transpire_0344646 | Perlwitz, Axel | 26 |
| 38 | Transpire_0344672 | Perlwitz, Axel | 10 |
| 39 | Transpire_0344682 | Perlwitz, Axel | 39 |

| | | | |
|---|---|---|---|
| 40 | Transpire_0344886 | Perlwitz, Axel | 14 |
| 41 | Transpire_0344900 | Perlwitz, Axel | 50 |
| 42 | Transpire_0344950 | Perlwitz, Axel | 7 |
| 43 | Transpire_0344957 | Perlwitz, Axel | 83 |
| 44 | Transpire_0345040 | Perlwitz, Axel | 56 |
| 45 | Transpire_0345096 | Perlwitz, Axel | 58 |
| 46 | Transpire_0345154 | Perlwitz, Axel | 83 |
| 47 | Transpire_0345237 | Perlwitz, Axel | 149 |
| 48 | Transpire_0345839 | Perlwitz, Axel | 103 |
| 49 | Transpire_0345942 | Perlwitz, Axel | 46 |
| 50 | Transpire_0345988 | Perlwitz, Axel | 111 |
| 51 | Transpire_0346103 | Perlwitz, Axel | 2 |
| 52 | Transpire_0346105 | Perlwitz, Axel | 2 |
| 53 | Transpire_0346151 | Perlwitz, Axel | 44 |
| 54 | Transpire_0346195 | Perlwitz, Axel | 5 |
| 55 | Transpire_0346206 | Perlwitz, Axel | 14 |
| 56 | Transpire_0346220 | Perlwitz, Axel | 30 |
| 57 | Transpire_0346332 | Perlwitz, Axel | 6 |
| 58 | Transpire_0346338 | Perlwitz, Axel | 9 |
| 59 | Transpire_0346347 | Perlwitz, Axel | 13 |
| 60 | Transpire_0346360 | Perlwitz, Axel | 17 |
| 61 | Transpire_0346387 | Perlwitz, Axel | 3 |
| 62 | Transpire_0346390 | Perlwitz, Axel | 5 |
| 63 | Transpire_0346395 | Perlwitz, Axel | 16 |
| 64 | Transpire_0346411 | Perlwitz, Axel | 19 |
| 65 | Transpire_0346430 | Perlwitz, Axel | 3 |
| 66 | Transpire_0346433 | Perlwitz, Axel | 11 |
| 67 | Transpire_0346445 | Perlwitz, Axel | 6 |
| 68 | Transpire_0346452 | Perlwitz, Axel | 38 |
| 69 | Transpire_0346490 | Perlwitz, Axel | 8 |
| 70 | Transpire_0346500 | Perlwitz, Axel | 14 |
| 71 | Transpire_0083713 | Perlwitz, Axel | 55 |
| 72 | Transpire_0346815 | Perlwitz, Axel | 272 |
| 73 | Transpire_0347087 | Perlwitz, Axel | 265 |
| 74 | Transpire_0347352 | Perlwitz, Axel | 115 |
| 75 | Transpire_0347467 | Perlwitz, Axel | 112 |
| 76 | Transpire_0347607 | Perlwitz, Axel | 22 |
| 77 | Transpire_0347794 | Perlwitz, Axel | 116 |
| 78 | Transpire_0347910 | Perlwitz, Axel | 37 |
| 79 | Transpire_0029042 | Perlwitz, Axel | 32 |
| 80 | Transpire_0081097 | Perlwitz, Axel | 40 |

| | 81 | Transpire_0081137 | Perlwitz, Axel | 39 |
|---|---|---|---|---|
| | 82 | Transpire_0081176 | Perlwitz, Axel | 208 |
| | 83 | Transpire_0081385 | Perlwitz, Axel | 200 |
| | 84 | Transpire_0082367 | Perlwitz, Axel | 63 |
| | 85 | Transpire_0082431 | Perlwitz, Axel | 62 |
| | 86 | Transpire_0028320 | Perlwitz, Axel | 238 |
| | 87 | Transpire_0036890 | Perlwitz, Axel | 140 |
| | 88 | Transpire_0038811 | Perlwitz, Axel | 308 |
| | 89 | Transpire_0040005 | Perlwitz, Axel | 117 |
| | 90 | Transpire_0039754 | Perlwitz, Axel | 144 |
| | 91 | Transpire_0037030 | Perlwitz, Axel | 167 |
| | 92 | Transpire_0038784 | Perlwitz, Axel | 27 |
| | 93 | Transpire_0039953 | Perlwitz, Axel | 52 |
| | 94 | Transpire_0039898 | Perlwitz, Axel | 55 |
| | 95 | Transpire_0037440 | Perlwitz, Axel | 353 |
| | 96 | Transpire_0037197 | Perlwitz, Axel | 243 |
| | 97 | Transpire_0039119 | Perlwitz, Axel | 353 |
| | 98 | Transpire_0085643 | Perlwitz, Axel | 74 |
| | 99 | Transpire_0082800 | Perlwitz, Axel | 4 |
| | 100 | Transpire_0082842 | Perlwitz, Axel | 27 |
| | 101 | Transpire_0080139 | Perlwitz, Axel | 118 |
| | 102 | Transpire_0080257 | Perlwitz, Axel | 119 |
| | 103 | Transpire_0080376 | Perlwitz, Axel | 47 |
| | 104 | Transpire_0080423 | Perlwitz, Axel | 47 |
| | 105 | Transpire_0084283 | Perlwitz, Axel | 45 |
| | 106 | Transpire_0046315 | Perlwitz, Axel | 165 |
| | 107 | Transpire_0008353 | Perlwitz, Axel | 12 |
| | 108 | Transpire_0008253 | Perlwitz, Axel | 42 |
| | 109 | Transpire_0023986 | Perlwitz, Axel | 100 |
| | 110 | Transpire_0024086 | Perlwitz, Axel | 15 |
| | 111 | Transpire_0000690 | Perlwitz, Axel | 6 |
| | 112 | Transpire_0000956 | Perlwitz, Axel | 42 |
| | 113 | Transpire_0080472 | Perlwitz, Axel | 101 |
| | 114 | Transpire_0080573 | Perlwitz, Axel | 109 |
| | 115 | Transpire_0082184 | Perlwitz, Axel | 49 |
| | 116 | Transpire_0082233 | Perlwitz, Axel | 50 |
| | 117 | Transpire_0082283 | Perlwitz, Axel | 42 |
| | 118 | Transpire_0082325 | Perlwitz, Axel | 42 |
| | 119 | Transpire_0084374 | Perlwitz, Axel | 153 |
| | 120 | Transpire_0023807 | Perlwitz, Axel | 66 |
| | 121 | Transpire_0024591 | Perlwitz, Axel | 48 |

| | | | |
|---|---|---|---|
| 122 | Transpire_0024656 | Perlwitz, Axel | 112 |
| 123 | Transpire_0062694 | Perlwitz, Axel | 128 |
| 124 | Transpire_0062822 | Perlwitz, Axel | 252 |
| 125 | Transpire_0057064 | Perlwitz, Axel | 61 |
| 126 | Transpire_0057125 | Perlwitz, Axel | 66 |
| 127 | Transpire_0057316 | Perlwitz, Axel | 48 |
| 128 | Transpire_0062527 | Perlwitz, Axel | 167 |
| 129 | Transpire_0063074 | Perlwitz, Axel | 206 |
| 130 | Transpire_0027657 | Perlwitz, Axel | 21 |
| 131 | Transpire_0027722 | Perlwitz, Axel | 94 |
| 132 | Transpire_0027816 | Perlwitz, Axel | 104 |
| 133 | Transpire_0062417 | Perlwitz, Axel | 110 |
| 134 | Transpire_0065386 | Perlwitz, Axel | 182 |
| 135 | Transpire_0067123 | Perlwitz, Axel | 184 |
| 136 | Transpire_0070142 | Perlwitz, Axel | 399 |
| 137 | Transpire_0008407 | Perlwitz, Axel | 3 |
| 138 | Transpire_0023682 | Perlwitz, Axel | 16 |
| 139 | Transpire_0008365 | Perlwitz, Axel | 42 |
| 140 | Transpire_0023234 | Perlwitz, Axel | 38 |
| 141 | Transpire_0008250 | Perlwitz, Axel | 3 |
| 142 | Transpire_0013991 | Perlwitz, Axel | 52 |
| 143 | Transpire_0022730 | Perlwitz, Axel | 76 |
| 144 | Transpire_0027628 | Perlwitz, Axel | 29 |
| 145 | Transpire_0029074 | Perlwitz, Axel | 6 |
| 146 | Transpire_0080682 | Perlwitz, Axel | 88 |
| 147 | Transpire_0080770 | Perlwitz, Axel | 94 |
| 148 | Transpire_0080864 | Perlwitz, Axel | 52 |
| 149 | Transpire_0080916 | Perlwitz, Axel | 51 |
| 150 | Transpire_0023698 | Perlwitz, Axel | 7 |
| 151 | Transpire_0023705 | Perlwitz, Axel | 77 |
| 152 | Transpire_0028046 | Perlwitz, Axel | 96 |
| 153 | Transpire_0028558 | Perlwitz, Axel | 52 |
| 154 | Transpire_0094510 | Perlwitz, Axel | 137 |
| 155 | Transpire_0094683 | Perlwitz, Axel | 410 |
| 156 | Transpire_0014043 | Perlwitz, Axel | 161 |
| 157 | Transpire_0022403 | Perlwitz, Axel | 266 |
| 158 | Transpire_0014204 | Perlwitz, Axel | 277 |
| 159 | Transpire_0022347 | Perlwitz, Axel | 56 |
| 160 | Transpire_0022053 | Perlwitz, Axel | 252 |
| 161 | Transpire_0092142 | Perlwitz, Axel | 535 |
| 162 | Transpire_0032642 | Perlwitz, Axel | 4154 |

| | | | |
|---|---|---|---|
| 163 | Transpire_0059255 | Perlwitz, Axel | 5 |
| 164 | Transpire_0000412 | Perlwitz, Axel | 25 |
| 165 | Transpire_0065260 | Perlwitz, Axel | 97 |
| 166 | Transpire_0000437 | Perlwitz, Axel | 104 |
| 167 | Transpire_0024548 | Perlwitz, Axel | 23 |
| 168 | Transpire_0029110 | Perlwitz, Axel | 13 |
| 169 | Transpire_0091287 | Perlwitz, Axel | 356 |
| 170 | Transpire_0091643 | Perlwitz, Axel | 10 |
| 171 | Transpire_0086583 | Perlwitz, Axel | 4686 |
| 172 | Transpire_0000610 | Perlwitz, Axel | 79 |
| 173 | Transpire_0029097 | Perlwitz, Axel | 13 |
| 174 | Transpire_0084786 | Perlwitz, Axel | 181 |
| 175 | Transpire_0024571 | Perlwitz, Axel | 20 |
| 176 | Transpire_0001284 | Perlwitz, Axel | 464 |
| 177 | Transpire_0001748 | Perlwitz, Axel | 130 |
| 178 | Transpire_0002226 | Perlwitz, Axel | 286 |
| 179 | Transpire_0002512 | Perlwitz, Axel | 5738 |
| 180 | Transpire_0091867 | Perlwitz, Axel | 274 |
| 181 | Transpire_0060300 | Perlwitz, Axel | 66 |
| 182 | Transpire_0060366 | Perlwitz, Axel | 64 |
| 183 | Transpire_0060430 | Perlwitz, Axel | 162 |
| 184 | Transpire_0060593 | Perlwitz, Axel | 160 |
| 185 | Transpire_0060753 | Perlwitz, Axel | 61 |
| 186 | Transpire_0060814 | Perlwitz, Axel | 61 |
| 187 | Transpire_0060875 | Perlwitz, Axel | 182 |
| 188 | Transpire_0057986 | Perlwitz, Axel | 87 |
| 189 | Transpire_0061085 | Perlwitz, Axel | 16 |
| 190 | Transpire_0094504 | Perlwitz, Axel | 6 |
| 191 | Transpire_0082811 | Perlwitz, Axel | 17 |
| 192 | Transpire_0082828 | Perlwitz, Axel | 4 |
| 193 | LUPIN_0010649 | Zeng, Xianming | 69 |
| 194 | LUPIN_0011194 | Zeng, Xianming | 10 |
| 195 | LUPIN_0011210 | Zeng, Xianming | 2 |
| 196 | LUPIN_0013490 | Zeng, Xianming | 53 |
| 197 | LUPIN_0248282 | Zeng, Xianming | 225 |
| 198 | LUPIN_0248600 | Zeng, Xianming | 7 |
| 199 | LUPIN_0248607 | Zeng, Xianming | 60 |
| 200 | LUPIN_0248667 | Zeng, Xianming | 15 |
| 201 | LUPIN_0250503 | Zeng, Xianming | 52 |
| 202 | LUPIN_0251436 | Zeng, Xianming | 34 |
| 203 | LUPIN_0251749 | Zeng, Xianming | 20 |

| | | | |
|---|---|---|---:|
| 204 | LUPIN_0253675 | Zeng, Xianming | 16 |
| 205 | LUPIN_0253741 | Zeng, Xianming | 129 |
| 206 | LUPIN_0253870 | Zeng, Xianming | 61 |
| 207 | LUPIN_0274584 | Zeng, Xianming | 47 |
| 208 | Transpire_0161559 | Dao, Thu | 3 |
| 209 | Transpire_0161562 | Dao, Thu | 3 |
| 210 | Transpire_0161565 | Dao, Thu | 3 |
| 211 | Transpire_0161568 | Dao, Thu | 3 |
| 212 | Transpire_0161571 | Dao, Thu | 3 |
| 213 | Transpire_0161580 | Dao, Thu | 3 |
| 214 | Transpire_0164718 | Dao, Thu | 4 |
| 215 | Transpire_0164727 | Dao, Thu | 2 |
| 216 | Transpire_0164729 | Dao, Thu | 4 |
| 217 | Transpire_0164738 | Dao, Thu | 4 |
| 218 | Transpire_0164742 | Dao, Thu | 5 |
| 219 | Transpire_0164747 | Dao, Thu | 4 |
| 220 | Transpire_0164839 | Dao, Thu | 4 |
| 221 | Transpire_0170195 | Dao, Thu | 273 |
| 222 | Transpire_0171273 | Dao, Thu | 280 |
| 223 | Transpire_0171633 | Dao, Thu | 275 |
| 224 | Transpire_0171976 | Dao, Thu | 284 |
| 225 | Transpire_0219509 | Dao, Thu | 7 |
| 226 | Transpire_0219618 | Dao, Thu | 9 |
| 227 | Transpire_0219659 | Dao, Thu | 9 |
| 228 | Transpire_0219970 | Dao, Thu | 69 |
| 229 | Transpire_0220039 | Dao, Thu | 71 |
| 230 | Transpire_0225634 | Dao, Thu | 2 |
| 231 | Transpire_0225648 | Dao, Thu | 2 |
| 232 | Transpire_0225732 | Dao, Thu | 8 |
| 233 | Transpire_0227768 | Dao, Thu | 273 |
| 234 | Transpire_0228495 | Dao, Thu | 281 |
| 235 | Transpire_0229215 | Dao, Thu | 281 |
| 236 | Transpire_0343885 | Perlwitz, Axel | 3 |
| 237 | Transpire_0346377 | Perlwitz, Axel | 10 |
| 238 | Transpire_0346107 | Perlwitz, Axel | 44 |
| 239 | Transpire_0346101 | Perlwitz, Axel | 2 |
| 240 | Transpire_0344209 | Perlwitz, Axel | 33 |
| 241 | Transpire_0344830 | Perlwitz, Axel | 47 |
| 242 | Transpire_0344877 | Perlwitz, Axel | 9 |
| 243 | Transpire_0344554 | Perlwitz, Axel | 83 |
| 244 | Transpire_0344721 | Perlwitz, Axel | 109 |

| | | | |
|---|---|---|---:|
| 245 | Transpire_0029080 | Perlwitz, Axel | 17 |
| 246 | Transpire_0346321 | Perlwitz, Axel | 4 |
| 247 | Transpire_0345386 | Perlwitz, Axel | 9 |
| 248 | Transpire_0080967 | Perlwitz, Axel | 130 |
| 249 | Transpire_0081751 | Perlwitz, Axel | 131 |
| 250 | Transpire_0344043 | Perlwitz, Axel | 16 |
| 251 | Transpire_0344156 | Perlwitz, Axel | 4 |
| 252 | Transpire_0305414 | Perlwitz, Axel | 80 |
| 253 | Transpire_0305430 | Perlwitz, Axel | 80 |
| 254 | Transpire_0305446 | Perlwitz, Axel | 80 |
| 255 | Transpire_0305462 | Perlwitz, Axel | 80 |
| 256 | Transpire_0305478 | Perlwitz, Axel | 80 |
| 257 | Transpire_0347579 | Perlwitz, Axel | 3 |
| 258 | Transpire_0000541 | Perlwitz, Axel | 1 |
| 259 | Transpire_0000542 | Perlwitz, Axel | 1 |
| 260 | Transpire_0000689 | Perlwitz, Axel | 1 |
| 261 | Transpire_0000697 | Perlwitz, Axel | 23 |
| 262 | Transpire_0000721 | Perlwitz, Axel | 24 |
| 263 | Transpire_0000805 | Perlwitz, Axel | 33 |
| 264 | Transpire_0000915 | Perlwitz, Axel | 41 |
| 265 | Transpire_0000998 | Perlwitz, Axel | 231 |
| 266 | Transpire_0016053 | Perlwitz, Axel | 5184 |
| 267 | Transpire_0021237 | Perlwitz, Axel | 671 |
| 268 | Transpire_0022669 | Perlwitz, Axel | 61 |
| 269 | Transpire_0022806 | Perlwitz, Axel | 38 |
| 270 | Transpire_0023123 | Perlwitz, Axel | 95 |
| 271 | Transpire_0023218 | Perlwitz, Axel | 6 |
| 272 | Transpire_0023230 | Perlwitz, Axel | 4 |
| 273 | Transpire_0023290 | Perlwitz, Axel | 10 |
| 274 | Transpire_0023335 | Perlwitz, Axel | 39 |
| 275 | Transpire_0023567 | Perlwitz, Axel | 10 |
| 276 | Transpire_0023577 | Perlwitz, Axel | 10 |
| 277 | Transpire_0023587 | Perlwitz, Axel | 10 |
| 278 | Transpire_0023669 | Perlwitz, Axel | 10 |
| 279 | Transpire_0023782 | Perlwitz, Axel | 25 |
| 280 | Transpire_0023873 | Perlwitz, Axel | 88 |
| 281 | Transpire_0023964 | Perlwitz, Axel | 22 |
| 282 | Transpire_0024131 | Perlwitz, Axel | 8 |
| 283 | Transpire_0024294 | Perlwitz, Axel | 37 |
| 284 | Transpire_0024331 | Perlwitz, Axel | 36 |
| 285 | Transpire_0024368 | Perlwitz, Axel | 3 |

| | | | |
|---|---|---|---|
| 286 | Transpire_0024775 | Perlwitz, Axel | 1 |
| 287 | Transpire_0024792 | Perlwitz, Axel | 2 |
| 288 | Transpire_0024967 | Perlwitz, Axel | 192 |
| 289 | Transpire_0026585 | Perlwitz, Axel | 181 |
| 290 | Transpire_0027678 | Perlwitz, Axel | 23 |
| 291 | Transpire_0027701 | Perlwitz, Axel | 21 |
| 292 | Transpire_0027922 | Perlwitz, Axel | 94 |
| 293 | Transpire_0028142 | Perlwitz, Axel | 117 |
| 294 | Transpire_0028259 | Perlwitz, Axel | 12 |
| 295 | Transpire_0029123 | Perlwitz, Axel | 12 |
| 296 | Transpire_0029135 | Perlwitz, Axel | 6 |
| 297 | Transpire_0029881 | Perlwitz, Axel | 5 |
| 298 | Transpire_0029886 | Perlwitz, Axel | 3 |
| 299 | Transpire_0030128 | Perlwitz, Axel | 202 |
| 300 | Transpire_0030537 | Perlwitz, Axel | 232 |
| 301 | Transpire_0037793 | Perlwitz, Axel | 983 |
| 302 | Transpire_0041654 | Perlwitz, Axel | 12 |
| 303 | Transpire_0042145 | Perlwitz, Axel | 9 |
| 304 | Transpire_0042154 | Perlwitz, Axel | 4 |
| 305 | Transpire_0042160 | Perlwitz, Axel | 6 |
| 306 | Transpire_0042166 | Perlwitz, Axel | 5 |
| 307 | Transpire_0042173 | Perlwitz, Axel | 5 |
| 308 | Transpire_0042178 | Perlwitz, Axel | 4 |
| 309 | Transpire_0042184 | Perlwitz, Axel | 4 |
| 310 | Transpire_0042207 | Perlwitz, Axel | 4 |
| 311 | Transpire_0042211 | Perlwitz, Axel | 6 |
| 312 | Transpire_0042229 | Perlwitz, Axel | 4 |
| 313 | Transpire_0042239 | Perlwitz, Axel | 6 |
| 314 | Transpire_0042247 | Perlwitz, Axel | 6 |
| 315 | Transpire_0042284 | Perlwitz, Axel | 4 |
| 316 | Transpire_0042293 | Perlwitz, Axel | 3 |
| 317 | Transpire_0042306 | Perlwitz, Axel | 8 |
| 318 | Transpire_0042621 | Perlwitz, Axel | 27 |
| 319 | Transpire_0042648 | Perlwitz, Axel | 27 |
| 320 | Transpire_0042675 | Perlwitz, Axel | 25 |
| 321 | Transpire_0044140 | Perlwitz, Axel | 4 |
| 322 | Transpire_0044225 | Perlwitz, Axel | 3 |
| 323 | Transpire_0044831 | Perlwitz, Axel | 164 |
| 324 | Transpire_0044995 | Perlwitz, Axel | 158 |
| 325 | Transpire_0045153 | Perlwitz, Axel | 156 |
| 326 | Transpire_0046480 | Perlwitz, Axel | 109 |

| | | | |
|---|---|---|---|
| 327 | Transpire_0057039 | Perlwitz, Axel | 7 |
| 328 | Transpire_0057055 | Perlwitz, Axel | 9 |
| 329 | Transpire_0057655 | Perlwitz, Axel | 9 |
| 330 | Transpire_0058575 | Perlwitz, Axel | 175 |
| 331 | Transpire_0059280 | Perlwitz, Axel | 9 |
| 332 | Transpire_0059405 | Perlwitz, Axel | 20 |
| 333 | Transpire_0059425 | Perlwitz, Axel | 24 |
| 334 | Transpire_0059449 | Perlwitz, Axel | 24 |
| 335 | Transpire_0059473 | Perlwitz, Axel | 22 |
| 336 | Transpire_0059495 | Perlwitz, Axel | 25 |
| 337 | Transpire_0059520 | Perlwitz, Axel | 21 |
| 338 | Transpire_0059541 | Perlwitz, Axel | 25 |
| 339 | Transpire_0059566 | Perlwitz, Axel | 25 |
| 340 | Transpire_0059591 | Perlwitz, Axel | 20 |
| 341 | Transpire_0059612 | Perlwitz, Axel | 24 |
| 342 | Transpire_0059636 | Perlwitz, Axel | 23 |
| 343 | Transpire_0059659 | Perlwitz, Axel | 24 |
| 344 | Transpire_0060128 | Perlwitz, Axel | 22 |
| 345 | Transpire_0060152 | Perlwitz, Axel | 8 |
| 346 | Transpire_0060164 | Perlwitz, Axel | 19 |
| 347 | Transpire_0060189 | Perlwitz, Axel | 9 |
| 348 | Transpire_0060212 | Perlwitz, Axel | 7 |
| 349 | Transpire_0060239 | Perlwitz, Axel | 22 |
| 350 | Transpire_0061057 | Perlwitz, Axel | 7 |
| 351 | Transpire_0061072 | Perlwitz, Axel | 4 |
| 352 | Transpire_0061076 | Perlwitz, Axel | 4 |
| 353 | Transpire_0061080 | Perlwitz, Axel | 5 |
| 354 | Transpire_0061101 | Perlwitz, Axel | 7 |
| 355 | Transpire_0061108 | Perlwitz, Axel | 4 |
| 356 | Transpire_0061112 | Perlwitz, Axel | 1 |
| 357 | Transpire_0061122 | Perlwitz, Axel | 8 |
| 358 | Transpire_0061130 | Perlwitz, Axel | 7 |
| 359 | Transpire_0061137 | Perlwitz, Axel | 9 |
| 360 | Transpire_0061146 | Perlwitz, Axel | 6 |
| 361 | Transpire_0061152 | Perlwitz, Axel | 11 |
| 362 | Transpire_0061163 | Perlwitz, Axel | 8 |
| 363 | Transpire_0061171 | Perlwitz, Axel | 6 |
| 364 | Transpire_0061202 | Perlwitz, Axel | 8 |
| 365 | Transpire_0061210 | Perlwitz, Axel | 1 |
| 366 | Transpire_0063370 | Perlwitz, Axel | 140 |
| 367 | Transpire_0063510 | Perlwitz, Axel | 191 |

| | | | |
|---|---|---|---:|
| 368 | Transpire_0063701 | Perlwitz, Axel | 148 |
| 369 | Transpire_0064072 | Perlwitz, Axel | 32 |
| 370 | Transpire_0064104 | Perlwitz, Axel | 53 |
| 371 | Transpire_0064164 | Perlwitz, Axel | 141 |
| 372 | Transpire_0065016 | Perlwitz, Axel | 172 |
| 373 | Transpire_0067357 | Perlwitz, Axel | 1237 |
| 374 | Transpire_0068594 | Perlwitz, Axel | 235 |
| 375 | Transpire_0068829 | Perlwitz, Axel | 125 |
| 376 | Transpire_0068954 | Perlwitz, Axel | 186 |
| 377 | Transpire_0069140 | Perlwitz, Axel | 80 |
| 378 | Transpire_0070665 | Perlwitz, Axel | 8422 |
| 379 | Transpire_0079627 | Perlwitz, Axel | 343 |
| 380 | Transpire_0079970 | Perlwitz, Axel | 112 |
| 381 | Transpire_0080082 | Perlwitz, Axel | 29 |
| 382 | Transpire_0080111 | Perlwitz, Axel | 28 |
| 383 | Transpire_0082569 | Perlwitz, Axel | 198 |
| 384 | Transpire_0082786 | Perlwitz, Axel | 10 |
| 385 | Transpire_0082796 | Perlwitz, Axel | 4 |
| 386 | Transpire_0082804 | Perlwitz, Axel | 5 |
| 387 | Transpire_0082809 | Perlwitz, Axel | 2 |
| 388 | Transpire_0082832 | Perlwitz, Axel | 10 |
| 389 | Transpire_0082869 | Perlwitz, Axel | 7 |
| 390 | Transpire_0083894 | Perlwitz, Axel | 300 |
| 391 | Transpire_0084329 | Perlwitz, Axel | 45 |
| 392 | Transpire_0084528 | Perlwitz, Axel | 115 |
| 393 | Transpire_0084684 | Perlwitz, Axel | 102 |
| 394 | Transpire_0084967 | Perlwitz, Axel | 117 |
| 395 | Transpire_0085084 | Perlwitz, Axel | 8 |
| 396 | Transpire_0085093 | Perlwitz, Axel | 8 |
| 397 | Transpire_0085101 | Perlwitz, Axel | 121 |
| 398 | Transpire_0085222 | Perlwitz, Axel | 111 |
| 399 | Transpire_0085333 | Perlwitz, Axel | 148 |
| 400 | Transpire_0085481 | Perlwitz, Axel | 109 |
| 401 | Transpire_0085717 | Perlwitz, Axel | 70 |
| 402 | Transpire_0085787 | Perlwitz, Axel | 74 |
| 403 | Transpire_0085862 | Perlwitz, Axel | 71 |
| 404 | Transpire_0085933 | Perlwitz, Axel | 148 |
| 405 | Transpire_0086081 | Perlwitz, Axel | 109 |
| 406 | Transpire_0095134 | Perlwitz, Axel | 26 |
| 407 | Transpire_0095197 | Dao, Thu | 33 |
| 408 | Transpire_0095292 | Dao, Thu | 1 |

| | | | |
|---|---|---|---:|
| 409 | Transpire_0095294 | Dao, Thu | 1 |
| 410 | Transpire_0095305 | Dao, Thu | 14 |
| 411 | Transpire_0095324 | Dao, Thu | 14 |
| 412 | Transpire_0095373 | Zeng, Xianming | 61 |
| 413 | Transpire_0095488 | Zeng, Xianming | 175 |
| 414 | Transpire_0095668 | Zeng, Xianming | 14 |
| 415 | Transpire_0095836 | Zeng, Xianming | 25 |
| 416 | Transpire_0095911 | Zeng, Xianming | 10 |
| 417 | Transpire_0107807 | Dao, Thu | 1 |
| 418 | Transpire_0108805 | Dao, Thu | 13 |
| 419 | Transpire_0108818 | Dao, Thu | 7 |
| 420 | Transpire_0108826 | Dao, Thu | 7 |
| 421 | Transpire_0108833 | Dao, Thu | 1 |
| 422 | Transpire_0108834 | Dao, Thu | 1 |
| 423 | Transpire_0108835 | Dao, Thu | 1 |
| 424 | Transpire_0108838 | Dao, Thu | 171 |
| 425 | Transpire_0109009 | Dao, Thu | 11 |
| 426 | Transpire_0109020 | Dao, Thu | 32 |
| 427 | Transpire_0109056 | Dao, Thu | 14 |
| 428 | Transpire_0109071 | Dao, Thu | 104 |
| 429 | Transpire_0109181 | Dao, Thu | 12 |
| 430 | Transpire_0109193 | Dao, Thu | 14 |
| 431 | Transpire_0109207 | Dao, Thu | 18 |
| 432 | Transpire_0109229 | Dao, Thu | 1 |
| 433 | Transpire_0109230 | Dao, Thu | 1 |
| 434 | Transpire_0109231 | Dao, Thu | 1 |
| 435 | Transpire_0109232 | Dao, Thu | 1 |
| 436 | Transpire_0109233 | Dao, Thu | 1 |
| 437 | Transpire_0109234 | Dao, Thu | 1 |
| 438 | Transpire_0109235 | Dao, Thu | 1 |
| 439 | Transpire_0109236 | Dao, Thu | 1 |
| 440 | Transpire_0109237 | Dao, Thu | 1 |
| 441 | Transpire_0109238 | Dao, Thu | 1 |
| 442 | Transpire_0109239 | Dao, Thu | 1 |
| 443 | Transpire_0109240 | Dao, Thu | 1 |
| 444 | Transpire_0109241 | Dao, Thu | 1 |
| 445 | Transpire_0109242 | Dao, Thu | 1 |
| 446 | Transpire_0109244 | Dao, Thu | 1 |
| 447 | Transpire_0109245 | Dao, Thu | 1 |
| 448 | Transpire_0109248 | Dao, Thu | 1 |
| 449 | Transpire_0109258 | Dao, Thu | 1 |

| | | | |
|---|---|---|---|
| 450 | Transpire_0109268 | Dao, Thu | 1 |
| 451 | Transpire_0109373 | Dao, Thu | 38 |
| 452 | Transpire_0109411 | Dao, Thu | 55 |
| 453 | Transpire_0109504 | Dao, Thu | 69 |