## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

---

LUPIN ATLANTIS HOLDINGS SA, and
LUPIN INC.

*Plaintiffs*,

vs.

XIAN-MING ZENG, TRANSPIRE BIO,
INC., AXEL PERLWITZ, and WILLIAM
SCHACHTNER,

*Defendants*.

Case No. 23-61621-CIV-MD

---

### JOINT PRE-TRIAL STIPULATION

Plaintiff Lupin Atlantis Holdings SA and Lupin Inc. ("Plaintiffs" or "Lupin"[1]) and Defendants Xian-Ming Zeng, Transpire Bio, Inc., Axel Perlwitz, and William Schachtner (collectively "Defendants"), by and through their respective undersigned counsel and pursuant to the Court's Order [D.E. 123] and Local Rule 16.1(e), respectfully submit this Joint Pre-Trial Stipulation.

## I.     STATEMENT OF THE CASE[2]

### A.     Lupin's Statement of the Case

1.     Lupin and its Trade Secrets

---

[1] The term "Lupin" is used throughout to refer to both Plaintiffs and/or their affiliated entities.

[2] Where any section in this Joint Pre-Trial Stipulation is attributed to either Lupin or Defendants, only, such as each party's Statement of the Case or respective identifications of remaining issues of law or fact, that section reflects the unilateral position of the submitting party, only. Neither party stipulates to the other side's statements or admits or acquiesces to any fact or argument asserted therein, or the characterization of an issue as one of law or fact. Rather, the Parties reserve all rights to dispute all facts and arguments set forth in each other's Statements of the Case and other independent sections and the submission of those issues to the factfinder or the Court, as appropriate. Disputes that the Parties wish the Court to resolve at the pre-trial conference are raised herein, but the Parties do not re-raise disputes already raised in other submissions, such as the motions for summary judgment, *Daubert* motions, or motions in limine.

Lupin was founded in 1968 as a family-owned company and has grown into one of the largest generic pharmaceutical companies in the world.  By 2010, Lupin was the fifth-largest generic drug manufacturer in the United States.

In 2013, Lupin hired Defendant Xian-Ming Zeng to launch Lupin's Center of Excellence for Inhalation Research in Coral Springs, Florida (the "LIRC"), a state-of-the-art facility for generic inhalation medicine development.  Zeng oversaw product development and regulatory filings at the LIRC in connection with numerous inhalation products, including albuterol sulfate (generic ProAir), tiotropium bromide (generic Spiriva HandiHaler ██████████████), mometasone formoterol inhalation aerosol (generic Dulera), beclomethasone formoterol, "Luforbec" (generic Fostair), and ██████████████████.  The LIRC was highly successful due in large part to Lupin's substantial investments in research and development activities, ████████████████████████████ and reflecting years of research by Lupin scientists, engineers, clinicians, and technologists.  For example, development of Lupin's tiotropium product (to which many of Lupin's asserted trade secrets relate) alone costs ████████████ and over nine years of research and development time.  A large amount of time was also devoted to navigating complex regulatory hurdles, such as submissions to the Food and Drug Administration (the "FDA").

Because of this significant research and development investment, including years navigating complex regulatory issues, Lupin possesses extensive trade secrets related to its clinical and pre-clinical drug development and its regulatory intelligence knowledge base.  The misappropriated trade secrets span across numerous aspects of Lupin's development of 10 different generic inhalation drugs, including Lupin's clinical and pre-clinical study protocols and reports, statistical analysis plans, and biochemical method development and validation reports.  Lupin's regulatory trade secrets similarly encompass a wide range of complex materials, including pre-ANDA correspondence, draft and final regulatory submissions, and multiple types of agency feedback on regulatory submissions covering nearly every aspect of the overall agency review and approval process.

2.   Transpire and Defendants' Scheme to Create a Lupin 2.0

On April 3, 2021, a representative from a company called Smoore International Holdings Ltd. contacted Zeng, as Lupin's senior leader, to discuss a potential collaboration between Smoore and Lupin in the inhalation drug space.  Instead of reporting the opportunity with Smoore to

2

Lupin's management—as Zeng's fiduciary duties required him to do—he took the opportunity for himself.  Zeng conspired with Smoore to start a new inhalation drug company called Transpire that would compete directly with Lupin in the generic inhalation medicine market.  Before departing for his new venture, Zeng copied hundreds of Lupin's confidential documents from his Lupin computer to multiple USB drives, which he would later access while at Transpire.  These documents included development and regulatory files related to multiple Lupin products and disclosed numerous trade secrets owned by Lupin.

To get Transpire off the ground, Zeng used the documents and trade secrets he had stolen from Lupin for Transpire's benefit.  For example, Transpire began development of a generic version of Fostair in July 2022.  On July 18, 2022—at approximately the same time that Transpire began working on its Gx ███—Zeng accessed Lupin's trade secrets concerning its Gx ███ regulatory submissions.  Similarly, Zeng accessed Lupin confidential documents while Transpire was developing a generic version of ████████.  These documents included Lupin's trade secrets contained in a copy of Lupin's ██████ DPI Design and Development Plan, FDA responses to multiple questions submitted by Lupin in connection to a pre-ANDA meeting request for its Gx ██████████ product, and a draft Briefing Document for Lupin's Gx ████ ██████ product.

Just like Zeng, other ex-Lupin employees who went to Transpire took Lupin's trade secrets on their way out the door.  For example, chief regulatory officer Axel Perlwitz copied thousands of Lupin files to an external device (called "My Passport").  While still at Lupin, Perlwitz began working for Transpire.  He reviewed and provided comments on an orphan drug application that Transpire was preparing for submission.  Perlwitz then left Lupin on October 5, 2022, and within *eight days* after joining Transpire, Perlwitz accessed confidential Lupin documents from the My Passport device and copied them onto his Transpire computer.  Like Zeng, Perlwitz accessed Lupin's confidential information during the same time period he worked on developing the same drugs at Transpire.  Another former Lupin employee, Thu Dao, copied thousands of Lupin files from his Lupin-issued laptop to a USB, which he then took with him to Transpire.  These files included all the work he was doing at Lupin.  After he arrived at Transpire, Dao copied all of these files from the USB to his Transpire computer.

In addition, despite contractually agreeing not to solicit Lupin employees for one year following his departure, Zeng successfully recruited two of his former direct reports at Lupin,

Defendants Axel Perlwitz and William Schachtner, during his non-solicitation period. At least nine former Lupin employees left because of Zeng's improper solicitation. These mass departures created significant disruption at Lupin's Coral Springs facility, costing Lupin hundreds of thousands in employee training and retention costs and product development delays.

The claims currently pending in this case are: (1) trade secret misappropriation against Zeng and Transpire (DTSA and FUTSA); (2) breach of contract against Zeng for the breach of his non-solicitation obligations to Lupin; and (3) breach of fiduciary duty claims against all individual defendants.

**B.    Defendants' Statement of the Case**

1.    The Defendants

Transpire is a pharmaceutical start-up company that develops innovative and generic inhalation medicines. Transpire has several generic and branded products in development, but has not yet obtained FDA approval for, marketed, or launched a single product.

Defendant Dr. Xian-Ming Zeng is Transpire's Director and CEO. Dr. Perlwitz is the Chief Regulatory Affairs Officer for Transpire. Mr. Schachtner is the Chief Technical Operations Officer. All three Defendants were previously employed by Lupin entities. Specifically, Dr. Zeng was the Executive Vice President of Lupin's inhalation center at Coral Springs. Mr. Schachtner was Lupin's Senior Director of Project and Manufacturing Management. Dr. Perlwitz was Lupin's Senior Director of Regulatory Affairs. Defendants were at-will employees of Lupin and did not have any non-compete obligations.

2.    Overview of the Development and Approval Processes for Generic Inhalation Drugs

This case pertains to the development of generic inhalation drugs. The relevant inhalation products are all for the treatment of asthma and chronic obstructive pulmonary disease. As with other pharmaceuticals, inhalation drugs fall into two classes: innovative (*i.e.*, branded) and generic. A branded drug is the first of its kind to be approved by regulators and sold in the commercial market. The vast majority (*i.e.* more than 80%, a ratio that will only increase as the company matures) of Transpire's development work focuses on innovative (or branded) products, which are targeted at conditions ███████████████████████████████████████ ████████████████████ that have never previously been treated using medication delivered via inhalation. In addition to its innovative development work, Transpire is also developing two

4

generic products: generic ████ a Soft Mist Inhaler ("SMI"), and generic ████, a Dry Powder Inhaler ("DPI").To promote competition and lower prices in the drug industry, the United States and other countries have passed laws and regulations that allow companies to develop and sell generic versions of the branded drugs, provided they can show the generic version is equivalent to the branded drug.  The generic drug is, by definition, a "copy" of the branded drug.  It is designed to be identical in terms of dosage form, strength, route of administration, quality, performance characteristics, and intended use.

Compared to the intensive approval process for branded drugs, the process for generic drugs is more streamlined and predictable. The branded drug maker has done the "heavy lifting" of demonstrating the drug's safety and effectiveness. The generic maker's task is to demonstrate its drug is equivalent to the branded drug, or the "Reference Listed Drug (RLD)." In particular, the generic drug company must show bioequivalence to the RLD. Bioequivalence refers to the similarity in the rate and extent of absorption of the active pharmaceutical ingredient ("API"), which is the same for the generic drug and the RLD, when given at the same dose and delivery conditions. For inhaled products, the generic maker must demonstrate "Q1 sameness," *i.e.*, that the inactive ingredients in the generic drug are substantially identical to those in the RLD, and "Q2 sameness," i.e., that the formulation is the substantially the same, based on the relative proportions of the active and inactive ingredients. A request for approval of a generic drug is submitted to the FDA through an *Abbreviated* New Drug Application ("ANDA").

The FDA and other regulatory agencies, as well as industry organizations, have promulgated thousands of detailed guidance and standards to ensure generic drugs are developed predictably and safely. This is particularly true for generic inhalation drugs. Because of their unique composition and delivery, inhalation drugs must undergo specific testing and qualification before they can be approved.  Through formal Draft Guidances, the FDA details the types of tests, studies, and analyses required to demonstrate bioequivalence between a proposed generic drug and the RLD. The guidances—which are both general and product-specific—serve as a roadmap for generic drug development.  Although the guidances are technically *recommendations*, they are treated as *requirements* that all companies follow as a matter of course.  In addition to showing that the chemical formulation is equivalent to the branded RLD, companies developing generic inhalation drugs must also show that the delivery device is equivalent to the branded RLD.

Because the development of generic inhalation drugs is driven by regulatory guidance and facilitated by CROs and CDMOs, it follows a routine and predictable approach. There is little room for innovation or trade secrets that set one company apart from another. Success comes from experience, knowledge, and skills to efficiently marshal resources and shepherd the process from start to finish.

The development of inhalation drugs is also facilitated by third-party contract research organizations ("CROs") and contract design and manufacturing organizations ("CDMOs"). These companies provide a host of products and services to the pharmaceutical companies, including formulation, manufacturing, device design, clinical study design and administration, laboratory services, and regulatory compliance.

### 3.   Transpire's Drug Pipeline

Transpire is developing both innovative and generic drugs. Dr. Zeng and Dr. Perlwitz's move away from Lupin was driven, in large part, by their desire to focus on innovative products. On the innovative side, Transpire has pursued inhalation therapeutics for the treatment of ███████████████████████████████████████████████████████████████████████████. On the generic side, Transpire initially focused on ███████████████████████████████████ (the last of which was abandoned, after the CDMO that was aiding its development dissolved). Consistent with Dr. Zeng's vision for the new company, Transpire's development of these drugs relied extensively on the services of CROs and CDMOs, which performed reverse engineering of the RLD, product formulation, testing and analytical method development, and device design.

### 4.   Dr. Zeng Builds Lupin's Inhalation Business

Dr. Zeng is a world-renowned leader in the field of inhalation drugs. Prior to working at Lupin, he served as the Vice President and Head of Global Respiratory Product Development for the branded products division of Lupin's competitor, Teva Pharmaceuticals Industries, Ltd. ("Teva"). At Teva, Dr. Zeng helped develop and launch ProAir HFA, a branded inhaler.

Lupin noticed Dr. Zeng's success, and, in 2013, recruited him to develop its new inhalation business. In the course of recruiting Dr. Zeng, Lupin's CEO, Vinita Gupta, communicated with him while he was still employed by Teva. In the course of those communications, Ms. Gupta solicited Dr. Zeng's views on how to develop an inhalation business for Lupin and specifically asked for his views on particular business opportunities that Lupin was considering, including

potential acquisitions that Lupin was reviewing.  In addition, Lupin intentionally hired Dr. Zeng to develop a generic version of ProAir, the pathbreaking branded inhalation drug whose development Dr. Zeng had led at Teva. As Senior Vice President—and later Executive Vice President—of Inhalation R&D, Dr. Zeng oversaw the drug development and FDA approval activities for Lupin's Coral Springs inhalation portfolio. Dr. Zeng spent more than eight years growing Lupin's inhalation business into a major industry player. He guided Lupin's development of the first FDA-approved generic version of the Teva ProAir device. He also led the development of Lupin's generic for the Spiriva Handihaler, a dry-powder inhaler that uses tiotropium bromide as an API. The product achieved FDA approval in 2023, and is viewed as one of Lupin's most important offerings. Dr. Zeng was also integral to Lupin's European launch of Luforbec, an alternative to Fostair for the treatment of chronic COPD.

Dr. Zeng was not a member of Lupin's Board of Directors and did not regularly participate in Board meetings. He did not report directly to the Board of Directors on any matters.

5.    Dr. Zeng Pursues a New Opportunity

On April 20, 2021, Zhiqiang Shi, Global Research and Development Director for Smoore International, a global leader in electronic cigarette and vaping manufacturing, contacted Dr. Zeng via email, stating:

> I am reaching out to experts like you in the medical inhalation device/drug formulation industry to explore potential collaborations, consulting, or recommendations of talents in the field to join us in our US R&D team. Smoore sees great potential to adapt and optimize the vaping technology and device in personal well-being and portable healthcare solutions as evidenced by the COVID epidemic.

Lupin receives many inquiries about potential collaborations or partnerships. It has no formal policies or procedures for analyzing potential opportunities; rather, its employees are expected to exercise their discretion to evaluate whether the opportunity is a strategic fit for Lupin's business priorities and to not waste time on opportunities that are not. The particular opportunity that Smoore approached Lupin with—*i.e.*, to combine vaping technology and inhaled medicines—is not one Transpire has ever considered or investigated and Dr. Zeng believes it is a scientific impossibility. Dr. Zeng also testified at his deposition that he informed Ms. Gupta, Lupin's CEO, who at the time was two levels above Dr. Zeng in the Lupin reporting structure,

about Smoore's overture and she did not express any interest in pursuing it for Lupin.  Ms. Gupta also testified that she is unaware of Lupin ever seriously evaluating any comparable opportunities.

Despite Smoore's initial idea for collaboration being a dead-end and a poor fit for Lupin's business activities, Dr. Zeng was ready for a change in his career. In particular, he was interested in working primarily on innovative products, which Lupin did not do; Dr. Zeng had proposed that Lupin begin developing innovative inhalation drugs, but Lupin's leadership had rejected that idea as too cost-intensive and risky. His discussions with Smoore continued and evolved over the next four months, as he searched for personal opportunities to work together. He ultimately accepted employment with Smoore and moved to China, where he began his work on Smoore's behalf. Dr. Zeng's last day at Lupin was October 1, 2021. His employment agreement with Lupin GmbH (the "Agreement") contained a one-year non-solicitation covenant that expired on October 1, 2022. Dr. Zeng left Lupin on good terms and continued his work on Lupin's behalf up through his last day of employment, including attempting to help find his replacement. When he left, Lupin lauded his significant contributions to Lupin's success, including his critical role in developing a generic version of the Spiriva HandiHaler Dry Powder Inhaler and his efforts to build Lupin's inhalation center.

Dr. Zeng's move allowed him to be close to his elderly parents, who lived in China. However soon after Dr. Zeng returned to China, his father and father-in-law passed away.  As a U.S. citizen , there was no further reason for Dr. Zeng to remain in China, so he returned to the United States in March 2022. Transpire was incorporated on April 12, 2022. Transpire is an indirect subsidiary of Smoore International Holdings Limited. Dr. Zeng was Transpire's first employee and neither Dr. Perlwitz nor Mr. Schachtner were involved in the original creation of Transpire.

6.    Dr. Perlwitz, Mr. Schachtner, and other Former Lupin Employees Seek
      Employment with Transpire

Following the departure of a key R&D lead like Dr. Zeng, one would have expected Lupin to promptly fill his shoes and maintain the momentum he created, but Lupin did not do so. The company promoted from within, naming Mukul Dalvi Vice President of R&D for the inhalation division, but he proved incapable of continuing Dr. Zeng's success. Pervasive complaints arose about Dr. Dalvi's communication skills, and the leadership team became frustrated with the direction of the R&D group. This coincided with low employee morale at the Coral Springs

facility; for example, due to cost concerns, Lupin staffed R&D scientists on manufacturing, which they did not like; and rampant employee departures to a number of competitor companies.

In in the winter of 2021 Dr. Perlwitz began to seek new employment, applying to jobs at established pharmaceutical companies including Liquidia and Avalyn. In March 2022, Dr. Perlwitz and Mr. Schachtner each separately reached out to Transpire's Chief Medical Officer, Dr. Mark Lepore, inquiring about potential new career opportunities. Dr. Zeng was not involved in these hiring discussions and did not encourage Dr. Perlwitz or Mr. Schachtner to seek employment with Transpire or instruct any other Transpire employee to do so. Spectrum Dynamic Research, a Smoore affiliate, subsequently offered Dr. Perlwitz and Mr. Schachtner employment. On May 11, 2022, Mr. Schachtner executed an Offer of Employment with SDR for the position of Chief Technical Officer, with a start date of July 1, 2022.

On or about May 23, 2022, Dr. Perlwitz informed Lupin that he intended to resign on July 1, 2022. However, Lupin requested that Dr. Perlwitz defer his departure until October 5, 2022, which was several days after the expiration of Dr. Zeng's one-year non-solicitation covenant. As a professional courtesy to Lupin and to ensure a smooth transition and put Lupin in as good of a position as possible (including by staying several weeks beyond the goal date for Lupin's generic Spiriva Handihaler US ANDA), Dr. Perlwitz agreed to this deferred start date, and began work at SDR on October 6, 2022, consistent with his agreement with Lupin to delay his departure. Meanwhile, he continued to work diligently on Lupin's behalf and worked to help identify potential successors.   At the end of September, 2022, when Dr. Perlwitz was in his last week at Lupin, Transpire's chief medical officer asked for his quick opinion on an orphan drug application that Transpire was working on and which Lupin was not developing.  Dr. Perlwitz responded to Dr. Lepore outside of his normal working hours at Lupin.

Between November 2022 and February 2023, *i.e.*, after Dr. Zeng's non-solicitation agreement had expired, Transpire hired seven other former Lupin employees whom Lupin has alleges are relevant to this action: Thu Dao, Guizhen Huang, Vicmary Rodriguez Cruz, Marzena Sanquini, Barbra Santiago Colon, Greer Balladin, and Derek Kuhn. None of these individuals were contacted or hired by Transpire before the expiration of Dr. Zeng's non-solicitation period on October 1, 2022. Rather, in all instances, these employees' first record contact with Transpire was November 2022 or later and involved either the employees initiating contact with Transpire, or

Transpire's head of Human Resources reaching out to them after expiration of Dr. Zeng's Agreement.

7.    Retention of Lupin Documents

When Dr. Zeng, Dr. Perlwitz, and former Lupin employee Thu Dao (Transpire's facility supervisor) left Lupin, they retained certain Lupin documents on their personal devices, including USBs. These documents were interspersed on their Lupin devices with numerous personal documents that these individuals desired and had the right to retain.

Lupin alleged in interrogatory responses that ~450 of these retained documents comprise the "trade secrets" that form the basis of its claims for trade secret misappropriation against Transpire and Dr. Zeng. Their scientific expert, Mr. Shafer, subsequently opined that only ~252 of these contain secret information. Neither Lupin nor Mr. Shafer has specified what information in these documents is purportedly "secret" or how that information is distinct from that which is publicly available (e.g., contained in FDA guidances and published clinical studies) or from general industry knowledge or Defendants' knowhow.

The disputed documents pertain to ten products: Gx ProAir HFA; Gx Brovana; Gx Fostair; ███████████; Gx Pulmicort; ████████████████████; Gx Perforomist; Gx Dulera; ███████; ███████; Gx Tobi. Information concerning these inhaled products is not applicable to different products, which use different formulations and delivery methods, and are based on different RLDs. ████████████████████████████████████████████████ ██████████████████████████. Moreover, in order to obtain approval from the FDA, a company must have all of the independent data to support and validate their independent development activities, meaning that it would not be possible to gain FDA approval based on undisclosed work performed by a competitor.

Defendants have not utilized any of Lupin's documents or information in connection with Transpire's drug development and regulatory activities (or otherwise), nor would it be feasible for them to do so. Lupin is not claiming drug devices, formulations, or methods as its purported trade secrets. Moreover, forensic discovery and forensic analysis revealed that no more than 32 of Lupin's alleged "trade secret" document were ever accessed by a Transpire employee after leaving Lupin, which Lupin's computer forensic expert conceded at his deposition. There is no evidence of any use by Transpire of any of the information in any of these documents, except for a cursory attempt by Dr. Perlwitz to use non-sensitive portions of a small handful of Lupin regulatory

documents (*i.e.*, headings) to create shell templates, for organizational purposes, that could be filled in with Transpire-specific information. These templates were abandoned, and Transpire is now relying on a CDMO to prepare the relevant regulatory submission.  Moreover, only one of the 32 documents even relates to a product that Transpire is presently developing and on their face (*i.e.* based on letterhead or other visible descriptions), 27 of those 32 documents were created by entities other than Lupin Inc., the Lupin entity claiming to own trade secrets misappropriated by Transpire and Dr. Zeng.

Transpire's drug development progress is solely the result of its independent efforts and the efforts of the CDMOs it has retained to assist it.

## II.     THE BASIS OF FEDERAL JURISDICTION

This Court has subject matter jurisdiction over Count I pursuant to 28 U.S.C. § 1331 for injunctive relief and damages based on claims of misappropriation of trade secrets arising under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836(c). The Court has supplemental jurisdiction over Count II for violation of the Florida Uniform Trade Secrets Act pursuant to 28 U.S.C. § 1367.

Lupin contends that the Court also has diversity jurisdiction. Defendants disagree. Lupin also contends that the Court has supplemental jurisdiction over Counts III, IV and VI pursuant to 28 U.S.C. § 1367. Defendants disagree.[3]

## III.    THE PLEADINGS RAISING THE ISSUES

1. Lupin's First Amended Complaint [D.E. 31]

2. Defendants' Answer and Affirmative Defenses to Lupin's First Amended Complaint [D.E. 133]

## IV.    UNDISPOSED MOTIONS

1. Defendants' *Daubert* Motion and Motion to Exclude and/or Strike the Expert Opinions of Patterson Shafer and Dawn Hall [D.E. 197]

2. Plaintiffs' Motion for Summary Judgment and Incorporated Memorandum of Law (Re: Defendants' Unclean Hands Affirmative Defense) [D.E. 200]

---

[3] Lupin notes that this issue was never before raised by Defendants.

3. Axel Perlwitz and William Schachtner's Motion for Summary Judgment Count VI (Breach of Fiduciary Duty) [D.E. 201]

4. Transpire's Motion for Summary Judgment [D.E. 202]

5. Xian-Ming Zeng's Corrected Motion for Summary Judgment on Counts I, II, III, and IV [D.E. 205]

6. Defendants' Omnibus Motion in Limine [D.E. 241]

7. Plaintiffs' Motions in Limine [D.E. 244]

8. Defendants' Objections to Sealed Order Denying Expedited Motion to Amend Scheduling Order to Include Deadline for Lupin to Provide Final Narrowed Disclosures of Specific Trade Secrets and Alternative Motion for Certification for Interlocutory Appeal [D.E. 237]

9. Defendant's Motion for Leave to File a Reply in Further Support of Their Objections to Sealed Order Denying Expedited Motion to Amend Scheduling Order to Include Deadline for Lupin to Provide Final Narrowed Disclosures of Specific Trade Secrets and Alternative Motion for Certification for Interlocutory Appeal [D.E. 237] [D.E. 270]

10. Defendants' Discovery Dispute Concerning Plaintiffs' Geographic Scope Objection to Defendants' Request for Production (noticed Oct. 25, 2024) [*See* D.E. 125 (Notice of Hearing)]

## V.    UNCONTESTED FACTS WHICH WILL REQUIRE NO PROOF AT TRIAL

This is a concise statement of uncontested facts that do not need to be separately proven at trial.  The parties may, during trial, present these facts for purposes of background and context, and all objections to such presentation are preserved.

1. Plaintiff Lupin Inc. is a Delaware corporation.

2. Plaintiff Lupin Atlantis Holdings SA is a foreign corporation.

3. Defendant Transpire Bio, Inc. is a Florida corporation.

4. Smoore International Holdings Ltd. ("Smoore") is a Cayman-registered corporation that sells electronic cigarette and vaping manufacturing.

5. Transpire was incorporated in Florida on April 30, 2022 as a wholly owned subsidiary of Smoore.

## VI.   ISSUES OF FACT WHICH LUPIN OR DEFENDANTS CONTEND REMAIN TO BE LITIGATED AT TRIAL[4]

### A.   Lupin's Identification of Remaining Facts

The following is a non-exclusive list of factual issues that Lupin believes are contested and remain to be litigated at trial:

1.     Whether Transpire and/or Zeng misappropriated Lupin's trade secrets.[5]

2.     Whether Zeng breached his employment agreement with Lupin.

3.     Whether Zeng, Perlwitz, and/or Schachtner breached their fiduciary duty to Lupin.

4.     The extent of damages flowing from Zeng and/or Transpire's misappropriation.

5.     The extent of damages flowing from Zeng's breach of contract.

6.     The extent of damages flowing from Zeng's, Perlwitz's, and/or Schachtner's breach of fiduciary duty.

7.     Whether Defendants' conduct was willful or malicious.

8.     The amount of punitive damages (if any) that should be awarded based on Defendants' unlawful conduct.

### B.   Defendants' Identification of Additional Remaining Facts[6]

---

[4] As noted in footnote 1, *supra*, the identification of an issue of fact by one party shall not be construed as a stipulation by the other that it is, in fact, an issue of fact, or that it remains to be adjudicated; rather, the Parties reserve all rights and arguments, including based on pending summary judgment motions and motions *in limine*.

[5] Lupin asserts that to the extent that Defendants now argue Lupin is claiming misappropriation of trade secrets belonging to other Lupin entities besides Plaintiffs, this argument is waived because Defendants failed to timely disclose this argument before the close of discovery. Defendants were asked multiple interrogatories requiring them to disclose their arguments on trade secret misappropriation and they did not disclose this argument.

[6] Defendants' failure to identify any material issue of law or fact in this Stipulation shall not be construed as an admission or waiver regarding the need for proof of that issue or element at trial. Defendants further note that, as argued in their summary judgment motions, they contend that there is no genuine disputed issue of fact as to any of Lupin's claims. Inclusion of an issue of fact in this section shall not be construed as an admission or waiver to the contrary. Rather, these issues are identified in the event and to the extent that the relevant summary judgment motions are denied.

The following is a non-exclusive list of factual issues that Defendants believe are contested and remain to be litigated at trial, and which are not identified in Lupin's Identification of Remaining Facts, *supra*:

**Misappropriation of Trade Secrets against Transpire and Dr. Zeng (Counts I and II)**

1.        Whether Lupin, Inc. owns the asserted trade secrets.[7]

2.        Whether Lupin, Inc. possesses trade secrets that are: i) not generally known or readily ascertainable; ii) derive independent economic value; and iii) were the subject of reasonable measures to keep them secret.

3.        Whether Lupin, Inc.'s claims for trade secret misappropriation were brought in bad faith.

4.        Whether Transpire independently developed its relevant products, including through reverse engineering.

5.        Whether Lupin, Inc. has unclean hands based on its exploitation of Teva information concerning Proair that bar its request for injunctive relief in connection with Counts I and II.

**Breach of Contract against Dr. Zeng (Count III)**

---

[7] Defendants contend that ownership of the alleged trade secrets is an affirmative element that Plaintiffs must prove at trial. *See, e.g.*, Eleventh Cir. Pattern Instruction 11.1 (instructing that "To prove [plaintiff's] claim, [plaintiff] must prove the following facts by a preponderance of the evidence. . . [plaintiff] owns a valid trade secret. . ."); *see also Acoustic Artistry LLC v. Peavey Elecs. Corp.*, 2012 WL 13019011, at *4 (N.D. Ala. Mar. 30, 2012) ("Courts generally require ownership in an alleged trade secret to satisfy standing's injury-in-fact element.") (citing *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 115-16 (2d Cir. 2009); *cf. Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) ("Where Plaintiffs "lack Article III standing, a court has no subject matter jurisdiction to hear their claim."). Defendants further contend that they have disputed the ownership of the alleged trade secrets since the inception of this action, including by denying that "Lupin Inc. possesses trade secrets" in their Answer (D.E. 133 ¶¶ 107, 116) and by pleading as Affirmative Defenses Nos. 2 and 9 that Counts I and II under the Defend Trade Secrets Act and Florida Uniform Trade Secrets Act are "barred, in whole or in part, to the extent that Lupin Inc. is not the owner of the alleged 'trade secrets.'" Defendants asserted various objections to Plaintiffs' contention interrogatories concerning Defendants' defenses to Plaintiffs' trade secret claims, and Plaintiffs did not move to compel further responses to these interrogatories. Transpire's supplemental interrogatory responses also referred Plaintiffs to its Answer and Affirmative Defenses (D.E. 133) and forthcoming Summary Judgment Motion (D.E. 202) for Transpire's legal positions.

14

6.       Whether LAHSA's claim for breach of Dr. Zeng's non-solicitation provision based on the alleged solicitation of Dr. Perlwitz is barred by the doctrines of waiver and acquiescence and/or equitable estoppel based on its affiliate's request, agreement, and/or acquiescence that Dr. Perlwitz defer his start date at Transpire to October 5, 2021, after the expiration of the non-solicitation clause.

**Breach of Fiduciary Duty against Dr. Zeng (Count IV)**

7.       Whether Dr. Zeng owed LAHSA and/or Lupin a fiduciary duty to disclose the alleged opportunity to collaborate with Smoore to the Board of Directors of any Lupin entity.

**Breach of Fiduciary Duty against Dr. Perlwitz and Mr. Schachtner (Count III)**

8.       Whether Dr. Perlwitz owed Lupin, Inc. a fiduciary duty.

9.       Whether Mr. Schachtner owed Lupin, Inc. a fiduciary duty.

## VII.   ISSUES OF LAW ON WHICH THERE IS AGREEMENT

1.       The Court has personal jurisdiction over the parties.

2.       The Court has subject matter jurisdiction over Count I because this case involves a federal question arising under the Defend Trade Secrets Act and supplemental jurisdiction over Count II.

3.       Venue lies properly in the Southern District of Florida.

4.       Plaintiffs' claims arise under the Defend Trade Secrets Act (18 U.S.C. § 1836), the Florida Uniform Trade Secrets Act (Fla. Stat. § 688.001 *et seq.*), and Florida state common law.

## VIII.   ISSUES OF LAW WHICH LUPIN OR DEFENDANTS CONTEND REMAIN FOR DETERMINATION BY THE COURT.[8]

### A.   Lupin's Remaining Issues of Law

Lupin contends that the following issues are issues of law for the court to decide.  To the extent the Court believes any of the below are questions of fact for the jury to decide, Lupin incorporates them by reference into Section VI.

1.       Whether Transpire and/or Zeng misappropriated Lupin's trade secrets.

---

[8] As noted in footnote 1, *supra*, the listing of an issue of law by one party shall not be construed as a stipulation by the other that it is, in fact, an issue of law, or an issue that remains to be adjudicated; rather, the Parties reserve all rights and arguments, including based on pending summary judgment motions and motions *in limine*.

2.      Whether Zeng breached his employment agreement with Lupin.

3.      Whether Zeng, Perlwitz, and/or Schachtner breached his fiduciary duty to Lupin.

4.      If Zeng and/or Transpire are found liable for misappropriation, whether to enjoin them from misappropriating Lupin's trade secrets.

5.      If Zeng and/or Transpire are found liable for misappropriation, whether to award Lupin compensatory damages.

6.      If Zeng and/or Transpire are found liable for misappropriation, whether to award Lupin punitive damages.

7.      If Zeng is found liable for breach of contract, whether to award Lupin compensatory damages.

8.      If Zeng, Perlwitz, and/or Schachtner is found liable for breach of fiduciary duty, whether to award Lupin compensatory damages.

9.      If Zeng, Perlwitz, and/or Schachtner is found liable for breach of fiduciary duty, whether to award Lupin punitive damages.

10.      If Defendants are found liable on any claim, whether to award Lupin pre-and post-judgment interest.

11.      Whether to award Lupin its costs in bringing this action and its attorneys' fees.

**B.      Defendants' Remaining Issues of Law[9]**

Defendants contend that the following legal issues remain for the Court's adjudication.

**Misappropriation of Trade Secrets against Dr. Zeng and Transpire (Counts I and II)**

1.      Whether Transpire Bio, Inc. is entitled to summary judgment on Counts I and II.

2.      Whether Dr. Zeng is entitled to summary judgment on Counts I and II.

3.      Whether Lupin, Inc. has identified its alleged trade secrets with sufficient particularity to survive summary judgment and proceed to trial.

---

[9] Defendants contend that the Court's Order Granting in Part Defendants' Motion to Dismiss limited Count IV for Breach of Fiduciary Duty against Dr. Zeng to the corporate opportunity theory. Therefore, Defendants contend that the Court has already determined that Lupin cannot maintain this claim based on alleged solicitation of former Lupin employees (both because of the independent tort doctrine and because this conduct occurred after Dr. Zeng's employment ended), and this is not a "remaining" issue of law.

4.      Whether to award Defendants their attorneys' fees incurred in defending against Plaintiffs' trade secret allegations.

5.       Whether Defendants are entitled to discovery of documents in the possession, custody, and control of Lupin affiliates located outside of the United States, including in India and Switzerland.

**Breach of Contract against Dr. Zeng (Count III)**

6.      Whether the Court has supplemental jurisdiction over Count III pursuant to 28 U.S.C. § 1367.

7.      Whether Dr. Zeng is entitled to Summary Judgment on Count III.

**Breach of Fiduciary Duty against Dr. Zeng (Count IV)**

8.      Whether the Court has supplemental jurisdiction over Count IV pursuant to 28 U.S.C. § 1367.

9.      Whether Dr. Zeng is entitled to summary judgment on Count IV

10.     Whether Lupin, Inc. and LAHSA's theory of usurpation of corporate opportunity against Dr. Zeng is confined to the theory specifically alleged in the Amended Complaint (D.E. 31 ¶ 4); *i.e.*, Dr. Zeng's alleged failure to report to Lupin's Board of Directors a potential opportunity for Lupin to collaborate with Smoore to adapt and optimize Smoore's vaping technology with Lupin's inhalation pharmaceutical drug business.

11.     Whether Lupin, Inc. and LAHSA are limited to an award of nominal damages for their claim for breach of fiduciary duty against Dr. Zeng (Count IV) based on their failure to disclose any damages related to these claims in connection with its Rule 26(A) disclosures and expert reports.

**Breach of Fiduciary Duty against Dr. Perlwitz and Mr. Schachtner (Count VI)**

12.     Whether the Court has supplemental jurisdiction over Count VI pursuant to 28 U.S.C. § 1367.

13.     Whether Dr. Perlwitz is entitled to summary judgment on Count VI.

14.     Whether Mr. Schachtner is entitled to summary judgment on Count VI.

15.     Whether mere "co-founding" of a competing business can establish a breach of fiduciary duty.

16.     Whether Lupin, Inc. is limited to an award of nominal damages for its claims for breach of fiduciary duty against Dr. Perlwitz and Mr. Schachtner (Count VI) based on its failure to disclose any damages related to these claims in connection with its Rule 26(A) disclosures and expert reports.

IX.    **A CONCISE STATEMENT OF STIPULATIONS BY THE PARTIES.**

A.    **Stipulations Addressing Lupin's Motions in Limine**

1.    No party will seek to introduce evidence or argument regarding the total net worth of a witness or other individual associated with a party.

2.    No party will seek to introduce evidence or argument regarding other lawsuits or government investigations, with the exception of FDA actions.[10]

3.    No party will seek to introduce evidence or argument regarding any opinions of an expert witness being excluded by another court.

4.    No party will seek to introduce evidence or argument regarding claims previously dismissed by the court unless referenced in the final jury instructions.

B.    **Stipulations Addressing Transpire's Motions in Limine**

1.    The parties will remove all confidentiality designations added pursuant to the Protective Order for purposes of trial but agree that doing so does not de-designate any such document under the Protective Order.  They will so inform the Court and seek guidance on sealing admitted exhibits.

2.    No party will seek to introduce evidence or argument that an expert witness is disloyal, engaged in improper conduct, or breached an agreement because they previously consulted for the opposing party.

3.    No party will make racist or inflammatory comments regarding race or national origin.

4.    No party will seek to introduce evidence or argument regarding forensic activity other than what has already been disclosed in a forensic expert's report, including exhibits and appendices thereto, or deposition, including alleging that Zeng used a wiping tool before he left Lupin.

5.    No party will seek to introduce evidence or argument that Transpire's alleged misappropriation of Lupin's trade secrets slowed Lupin's drug development.

---

[10] However, Defendants contend that, if Lupin opens the door to these issues (*e.g*., by emphasizing its respect for third-parties' intellectual property rights), they may seek to present evidence of Lupin's patent infringement, for impeachment purposes. Lupin contends that such evidence should be excluded. *See* Lupin's MIL No. 6 and Defendants' response in opposition.

6.  No party will seek to introduce evidence or argument regarding Blitz Therapeutics.

7.  No party will affirmatively raise criminal law or criminal liability.

## X.   EXHIBITS

A preliminary list of the parties' proposed exhibits is attached as **Exhibit A** (Lupin) and **Exhibit B** (Defendants).  The parties reserve the right to use exhibits listed on another party's exhibit list.  The parties reserve the right to use additional exhibits not listed by either party for impeachment purposes, as necessary.

Objections in Exhibits A-B are identified in accordance with the objection codes below[11]:

| Objection Code | Objection | Explanation |
|---|---|---|
| A | Authenticity | FRE 901 |
| I | Contains inadmissible matter | Contains inadmissible matter (mentions insurance, prior conviction, etc.) |
| R | Relevance | FRE 401/402 |
| H | Hearsay | FRE 801/802/803 |
| UP | Unduly prejudicial-probative value outweighed by undue prejudice | FRE 403 |
| P | Privileged | Exhibit is or contains attorney-client communications or attorney work product. |
| 1002 | Best evidence | FRE 1002 |
| 1006 | Improper summary | FRE 1006 |
| W | Exhibit does not match description / wrong document | Used to identify clerical issues with the other side's list – for example, because the description does not match the copy of the exhibit provided. |
| INC | Incomplete document | Used to identify clerical issues – for example, because the copy provided is incomplete or missing pages, or because a more complete version exists. |
| M | Multiple documents | Used to identify clerical issues – for example because the other |

---

[11]  The parties have agreed to reserve all foundation objections and thus have not included those objections in Exhibits A and B.

| | | side combined multiple documents or files in a single exhibit, and needs to break them into individual exhibits. |
|---|---|---|
| NB | No Bates range or incorrect Bates range | Used to identify clerical issues – for example because the other side did not provide a Bates range, or the Bates range on the list does not match the exhibit. |
| NE | Not evidence | Exhibit is not evidence. |
| NP | Exhibit not provided | Used to identify clerical issues – for example because the other side failed to provide a copy of the exhibit. |
| NTD | Not timely disclosed | Used to identify exhibits that were not timely disclosed or produced. |
| Q | Poor quality/illegible | Used to identify clerical issues - copy provided by is poor quality or illegible and should be replaced. |
| MIL | Subject of motion *in limine* | Document should be excluded if the Court grants the referenced MIL. |
| 408 | Privileged settlement communications | Exhibit is or reflects a settlement offer or conduct or statements made in the context of settlement negotiations. |

The parties also agree to the following:

**A.      Documentary and Physical Exhibits**

8.      Lupin's trial exhibits will be identified with PTX numbers.  Defendants' trial exhibits will be identified with D-numbers.  Joint trial exhibits will be identified with JTX numbers.

9.      The parties agree that any description of a document on an exhibit list is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding the listed document or any other listed document.

10.      On or before June 2, 2025, the Parties shall provide certified translations of all exhibits that they intend to introduce at trial that contain text in a foreign language.

### B.      Demonstrative Exhibits

11.      Exhibits that the parties intend to use at trial solely for demonstrative purposes and will not offer as  evidence ("demonstrative exhibits") do not need to be specifically described on the parties' respective exhibit lists. Lupin's demonstrative exhibits will be identified with PDX numbers, starting with PDX-1.  Defendants' demonstrative exhibits will be identified with DDX numbers, starting with DDX-1.

12.      The parties shall exchange demonstratives (e.g., PowerPoint slides and boards) to be used in opening statements by 3:00 p.m. one calendar day before opening statements.  Any objections shall be provided no later than 6:00 p.m. one calendar day before their intended use. The parties are to meet and confer to resolve any objections to the demonstratives for opening statements at 7:00 p.m. one calendar day before opening statements.

13.      The parties shall provide demonstrative exhibits to be used in connection with direct examination of live witnesses  by 6:00 p.m. one calendar day before their intended use.  Any objections shall be provided no later than 8:00 p.m. one calendar day before their intended use. The parties are to meet and confer to resolve any objections at 9:00 p.m. one calendar day before the demonstratives' intended use.

14.      If good-faith efforts to resolve objections to demonstrative exhibits fail, the objecting party shall bring its objections to the Court's attention the morning of the opening statement or the day the witness is being called to the witness stand.

15.      The party seeking to use a demonstrative shall provide a color representation of the demonstrative to the other side in PDF format.  However, for a demonstrative containing video animations, the party seeking to use the animation shall provide it to the other side via a secure file share.

16.      For physical demonstratives, the party seeking to use the demonstratives shall provide a color representation as a PDF of 8.5" x 11" copies of the demonstratives.

17.      These provisions do not apply to demonstratives created during testimony or demonstratives to be used for cross-examination, neither of which need to be provided to the other side in advance of their use.

18.      A demonstrative that is merely a blow-up, highlight, or annotation of an exhibit, or of a single piece of continuous testimony that has already been admitted into evidence, without title or added text, is not required to be provided to the other side in advance of its use.

### C.      Exchange of Exhibits for use With a Witness

19.      Each party shall identify by number the exhibits it expects to use on direct examination of a witness by 8:00 p.m. two calendar days before the witness will testify live. The party receiving the list of exhibits shall provide the identifying party with any objections to the listed exhibits by 8:00 p.m. via electronic mail to counsel of record the following day. The parties shall then meet and confer as soon as possible to resolve any objections, and no later than 12:00 a.m. the day of their intended use.  This notice provision does not apply to exhibits used on cross-examination.

20.      If good faith efforts to resolve objections to witness exhibits fail, the objecting party shall bring its objections to the Court's attention the morning of the day the witness is being called to the witness stand.

### D.      Lupin Identification of Disputes Concerning Admission of Exhibits at Trial

21.      Lupin contends there are two proposals for the Court's resolution at the pre-trial conference related to trial mechanics.  *First*, Lupin proposes that the fact that a document appears on a party's exhibit list does not mean that it is admissible against that party, including but not limited to because hearsay applies differently depending on which party is admitting the evidence.

22.      *Second*, to facilitate the use of exhibits at trial, Lupin proposed several stipulations for purposes of efficiency:

- **Authenticity:** Lupin has proposed that the parties stipulate to the authenticity of exhibits that have been produced by a party and appear on their face to be business records (e.g., internal emails, financials, PowerPoint presentations created by the producing party in the ordinary course of their business), unless the party has a good faith belief disputing the exhibit's authenticity.  Lupin's position is that this will avoid the parties having to needlessly call additional witnesses at trial merely to authenticate documents where there is no dispute as to the authenticity.

- **Admission through Experts:**  Lupin has further proposed stipulating that such documents are admissible if used with a witness, including an expert witness, subject to resolution of other objections to the admissibility of these exhibits, including but not limited to Fed. R. Evid. 106, 401, 402, 403, 408, 805 (hearsay within hearsay objections), 1002, and any applicable order granting a motion in limine, as well as

objections on the grounds that the documents were not timely produced, were not timely disclosed, or were not within the scope of an expert's report, pursuant to Fed. R. Civ. P. 26.  For clarity, Lupin proposes that documents may be admitted for the first time through an expert witness who need not have direct, personal knowledge of the exhibit outside of the expert's assignment on this case.

Lupin contends that trial exchanges, which are done in the midst of trial, are not sufficient to avoid the wasted time and resources that may be required from having to call fact witnesses to authenticate each and every document.  These exchanges are not done far enough in advance to resolve the issue.[12]  Lupin believes it will be time-wasting where the Parties do not genuinely dispute the authenticity of documents to require witnesses to be called to authenticate every document, and therefore propose that in the alternative, time spent authenticating documents where there is no good faith dispute as to their authenticity be charged to the opposing party.

> **E.   Defendants' Position Concerning Plaintiffs' Proposed Authenticity/Admissibility Stipulations**

23.   Defendants contend that the Federal Rules of Evidence provide the necessary framework for resolving questions of authenticity and admissibility, and Defendants are not required to waive any applicable protections under these rules on a wholesale basis in advance of trial.

24.   This is particularly true given the magnitude of Plaintiffs' alleged trade secret population (which they contend is as numerous as 450 documents) and the volume of exhibits contained on the Parties' exhibit lists. Plaintiffs' Exhibit List includes thousands of exhibits, including foreign language exhibits. While Defendants' Exhibit Lists differentiated between those exhibits Defendants "expect to offer" and those they "may offer," consistent with what Defendants contend are best practices in this District, Plaintiffs declined to do so. In other words, at this juncture, Defendants do not have a meaningful sense of which of Plaintiffs' thousands of potential exhibits Plaintiffs will ultimately seek to offer at trial.

---

[12] Lupin contends that the Local Rules do not require the Parties to separately identify which exhibits they "expect" to use or what they "may" use, it simply requires them to list everything they expect to use or may use on their exhibit lists. Lupin has done so.  In any event, the trial mechanics issues would remain regardless of how the exhibits were identified, and Lupin thus seeks clarity on this issue in an effort to avoid time wasting for the jury and this Court.

25.     Given the yet-unknown nature of the exhibits that will actually be presented at trial and volume of potential exhibits, it is premature to reach any agreements concerning the authenticity or admissibility of any particular exhibit.

26.     Any objections Defendants assert to authenticity and admissibility will be made in good faith in conformance with the applicable Federal Rules of Evidence and rules of this Court.

27.     Further, the Parties' stipulations concerning the advance exchange of exhibits will ensure that the Parties have a meaningful opportunity to attempt to resolve disputes concerning admissibility and authenticity prior to the exhibits being presented at trial, to minimize the burden on the Court and streamline trial, as practicable.

## XI.     WITNESSES

The parties' witnesses who will testify in person and by deposition are set forth in the attached Witness Lists. Any witness not listed will be precluded from testifying, absent good cause shown. The parties also agree as follows:

1.     The parties reserve the right to call additional witnesses to provide foundation testimony should any party contest the authenticity or admissibility of any material proffered at trial.

2.     The order of presentation will follow the burden of proof:  First, Lupin will present its case-in-chief.  Then, Defendants will present their response thereto.  Then, Lupin will present its rebuttal case, if any.   To the extent the schedules of the witnesses necessitate presenting testimony out of order, the party sponsoring the witness will advise the opposing party promptly after they discover the issue, and the parties will make a good faith effort to accommodate such needs.

3.     Unless otherwise agreed between the parties, the parties will identify the witnesses they expect to call live for direct examination, and the order in which they expect to call said witnesses, by 8:00 p.m. three calendar days before the direct examination is expected to take place.

4.     Prior to the start of the direct testimony of any witness, the party offering the witness shall provide a binder containing copies of the exhibits intended for use with that witness to the Court and to the opposing party.

5.     The parties agree in principle that, to the extent possible, each live witness will testify once.

**A.       Witness Lists**

6.       The parties' witness lists are attached as **Exhibit C** (Lupin) and **Exhibit D** (Defendants).[13]

**B.       Testimony by Deposition**

7.       Lupin's deposition designations, Defendants' objections and counter-designations to the offered testimony, and Lupin's objections to Defendants' counter-designations are set forth in **Exhibit E**.  Inclusion of deposition designations in **Exhibit E** is neither an admission nor a representation as to the admissibility of or relevance to any issue of any deposition designation. By designating deposition testimony, Lupin is neither representing nor admitting that Lupin has the burden of proof on any topic.

8.       Defendants' deposition designations, Lupin's objections and counter-designations to the offered testimony, and Defendants' objections to Lupin's counter-designations are set forth in **Exhibit F**.  Inclusion of deposition designations in **Exhibit F** is neither an admission nor a representation as to the admissibility of, or relevance to, any issue of any deposition designation. By designating deposition testimony, Defendants are neither representing nor admitting that Defendants have the burden of proof on any topic.

9.       The parties agree that except for testimony used for impeachment, **Exhibits E and F** will contain the maximum universe of deposition designations, counter-designations, and objections to admission of deposition testimony.  None of the foregoing shall be supplemented without approval of all parties or leave of the Court, on good cause shown, except to correct inadvertent omission of part of a question or answer already designated.  The exception to this is for witnesses that the parties have indicated will appear at trial.  Should a witness become unavailable, the party whose witness that is will promptly notify the opposing party.  The party whose witness it is will provide designations within 24 hours of the notification.  Cross-designations will be due within 24 hours of the designations.  For the avoidance of doubt, this exception only applies to witnesses for whom deposition designations would have been appropriate in the first instance, had a party not indicated that witness would be present at trial.

---

[13] Lupin objects to the inclusion of an unnamed and unidentified "corporate representative" on Defendants' witness list.

10.     Unless otherwise agreed by the parties, any party intending to enter testimony by deposition shall disclose its final affirmative designations by 7:00 p.m. three calendar days before the deposition is to be used at trial.  The opposing party shall provide the designating party with any objections or counter-designations to the affirmative designations by 6:00 p.m. the day following receipt of the designating party's affirmative designations.  To the extent necessary, the designating party will provide the opposing party with any objections to the opposing party's counter-designations by 12:00 a.m. the following day (the day before the deposition testimony is to be entered).  The parties will then meet and confer by 7:00 p.m. that day (one day before the deposition testimony is to be entered) to resolve any disputes.  If the parties are unable to resolve remaining disputes, they will raise the issue to the Court the day before the deposition testimony is to be entered.  For any testimony Lupin wishes to play on the first day of trial, if the Court is unable to address disputes the day before the trial begins, the parties will raise disputes to the Court that day, either in the morning before jury selection or during a break.

11.     To the extent admissible, a party may introduce the deposition excerpt by video or by having one counsel designated by the offering party read the transcript aloud in a neutral manner.  When deposition designation excerpts are introduced, all admissible deposition counter-designation excerpts, whether offered by video or by transcript, will be introduced simultaneously in the sequence in which the testimony was originally given.  If a party opts to introduce deposition testimony by video, any counter-designations of that same witness's deposition testimony must also be submitted by video.

12.     All colloquy between counsel and objections will be eliminated when the deposition is read or viewed at trial.

13.     If an exhibit is referenced in a portion of deposition testimony that has been designated by either party, the exhibit is admitted into evidence if it is included on the offering party's trial exhibit list and is not otherwise objected to, or is included on the joint trial exhibit list without any objections by the opposing party.

14.     To the extent such designations are read or played in open court, each party will be charged for the time taken to read or play the designations and responsive counter-designations the party has identified for presentation, as measured by the time it takes to read or play the testimony that the party designated. A party will not be charged with the time for playing or reading

another party's designations or counter-designations. Instead, those designations or counter-designations will counter against will be charged against the party who made them.

15.    All procedures regarding deposition designations do not apply to portions of deposition transcripts and/or video used for impeachment or cross-examination of a witness.  Any deposition testimony may be used at trial for the purpose of impeachment, regardless of whether a party specifically identified that testimony on its list of deposition designations, if the testimony is otherwise competent for such purpose.

## XII.   ESTIMATED TRIAL TIME

The parties estimate trial will take two weeks (9 days) and agree to split time evenly at 17 hours per side, including opening statements and closing arguments.  Of those 17 hours, each party will have up to 1.25 hour for opening statements and up to 1.5 hours for closing statements.

## XIII.   ESTIMATED ATTORNEYS' FEES

### A.    Lupin's Estimate

Lupin seeks an award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and Florida Statutes § 688.005 based on Defendants' willful and malicious misappropriation of Lupin's trade secrets, in an amount to be determined following trial.  Lupin disputes that Defendants are entitled to attorneys' fees and/or costs under 18 U.S.C. § 1836(b)(3)(D) and Florida Statutes § 688.005, at all.

### B.    Defendants' Estimate

Defendants Dr. Zeng and Transpire Bio, Inc. seek an award of their attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and Florida Statutes § 688.005 based on Lupin Inc.'s bad faith assertion of its claims for trade secret misappropriation, in an amount to be determined following trial. Defendants dispute that Lupin is entitled to attorneys' fees and/or costs under 18 U.S.C. § 1836(b)(3)(D) and Florida Statutes § 688.005, at all.

Dated:  May 19, 2025

| | |
|---|---|
| */s/ Peter Bartoszek* | */s/ Samuel G. Williamson* |

Peter Bartoszek
Florida Bar No. 1015519
WICKER SMITH O'HARA MCCOY &
FORD, P.A.
390 N. Orange Ave., Suite 1000
Orlando, FL 32801
(407) 843-3939

 *and*

Joshua L. Simmons, P.C.
 (admitted *pro hac vice*)
Maggie LaPoint (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Sharre Lotfollahi, P.C. (admitted *pro hac vice*)
Sarah Mikosz (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
(310) 552-4200

Greg Polins (admitted *pro hac vice*)
Dan Sinclair (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000

Ashley Cade (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave. N.W.
Washington, D.C. 20004
(202) 389-5000

*Attorneys for Plaintiffs Lupin Atlantis*
*Holdings SA and Lupin Inc.*

Samuel G. Williamson
Florida Bar. No. 1033817
Olga Viera
Florida Bar No. 29783
Shalia M. Sakona
Florida Bar No. 107398
QUINN EMANUEL URQUHART &
SULLIVAN LLP
2601 S. Bayshore Drive, Suite 1550
Miami, Florida 33133-5417
(305) 402-4880

Jared Newton (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
1300 I Street NW
Suited 900
Washington, DC 20005

Nima Hefazi (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

Andrew G. Shifren (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
295 5th Avenue
New York, New York 10016
(212) 849-7181

*Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 19th day of May 2025, I caused a true and correct

copy of the foregoing document to be electronically filed with the Clerk of the Court using

CM/ECF, which will send notification of such filing to all counsel of record.


*/s/ Peter Baroszek*
Peter Bartoszek
Florida Bar No. 1015519